John E. Kelly
john@klawteam.com
Kelly Law Team
1 E Washington Street, Suite 500
Phoenix, Arizona 85004-2558
Tel: 602.283.4122
Fax: 602.281.6885

Rafey S. Balabanian*
rbalabanian@edelson.com
Eve-Lynn J. Rapp*
erapp@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

*Pro hac vice admission to be sought

[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

SEALED

| | |
|---|---|
| CHRISTIAN SCHRECKER, individually and on behalf of all others similarly situated, | Case No. CV-16-3511-PHX-DJH |
| *Plaintiff*, | |
| v. | **JURY DEMAND** |
| RADLINK, INC, a California corporation, | **FILED UNDER SEAL** |
| *Defendant*. | |

FILED
LODGED
RECEIVED
COPY

OCT 1 3 2016

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

# CLASS ACTION COMPLAINT

Plaintiff Christian Schrecker brings this Class Action Complaint against Defendant Radlink, Inc. ("Radlink" or "Defendant") to put an end to Defendant's practice of systematically exposing confidential patient information and storing patient data without adequate security. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief, including investigation conducted by his attorneys, as to all other matters.

## NATURE OF ACTION

1. Defendant Radlink is a medical device manufacturer and software developer in the field of radiology. By using Radlink's products, radiologists can remotely view and access patients' medical information, including x-ray and CAT scan images, and conduct analysis to reach a diagnosis.

2. To facilitate remote diagnosis, Radlink provides internet linked "portals" into physicians' and clinics' patient databases. Radlink's portals are public websites that (when configured correctly) require users to enter usernames and passwords before they are granted access to private patient information.

3. Unfortunately, Defendant fails to keep patients' confidential medical information secure. Specifically, Defendant's portals suffer from critical vulnerabilities that render usernames and passwords worthless. As a result, confidential medical information entrusted to Radlink by its clients and their patients has been exposed and is at great risk of further unauthorized distribution. Worse, public information indicates that Defendant's servers (if not patient data) has already been compromised by hackers.

4. Radlink has injured its clients' patients by charging and collecting market-

1 rate fees without providing industry standard protections for patient data confidentiality.

2 The longer Radlink is allowed to maintain its vulnerable and compromised systems, the

3 more likely its patients will become victims of a data breach. Alternatively, if a breach

4 has already occurred, each day that passes without knowledge and notice of a breach puts

5 patients' confidential medical information in greater danger of widespread distribution.

6     5.     Accordingly, this putative class action lawsuit seeks (i) to compel Radlink

7 to stop exposing and releasing patients' confidential medical information by

8 implementing industry standard protocols, (ii) to compel Radlink to allow an

9 independent, third-party firm to conduct a security audit, (iii) to inform patients with

10 information stored by Radlink that their information has been exposed, and (iv)

11 attorneys' fees and costs.

12 **PARTIES**

13     6.     Plaintiff Christian Schrecker is a natural person and citizen of the State of

14 Arizona.

15     7.     Defendant Radlink, Inc. is a corporation incorporated under the laws of the

16 state of California with a principal place of business at 815 North Nash Street, El

17 Segundo, California 90245. Defendant conducts business throughout this District, the

18 State of Arizona, and the United States.

19 **JURISDICTION AND VENUE**

20     8.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2)

21 because (a) at least one member of the class is a citizen of a state different from

22 Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and

23 costs, and (c) none of the exceptions under that subsection apply to this action.

9.     The Court has personal jurisdiction over Defendant because Defendant conducts significant business transactions in this District, and because the wrongful conduct occurred in and/or was directed to this District.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, Plaintiff resides in this District, and because Defendant resides in this District.

## FACTUAL ALLEGATIONS

**I.     Introduction to Radlink and its Radiological Data Portals.**

11.     Radlink is a software developer and medical device manufacturer in the field of radiology. Radlink partners with physicians and clinics to transition analog (i.e., film) radiological equipment to digital. Radlink's clients include, for instance, Strategic Imaging MD ("Strategic Imaging"), a radiological group that specializes in teleradiology, which is the ability to remotely view and diagnose patients' x-rays and CT scans. Strategic Imaging explains teleradiology in the following way:

> Many of us trained before digital imaging was an option. All analog film was read in-house, and many hours were spent processing films. Some new radiology graduates have never read a nondigital film, and they've never had to drive back to the hospital to read a CT performed after hours. These exams can now be quickly processed and transferred to any location where an expert can review the study.[1]

12.     Radiologists purchase Radlink devices and software to service their own practices. Then those customers, like Strategic Imaging, partner with physicians groups,

---

[1]     *Teleradiology supports local radiologists, hospitals, patients,*
https://www.auntminnie.com/index.aspx?sec=log&URL=http%3a%2f%2fwww.au
ntminnie.com%2findex.aspx%3fsec%3dsup%26sub%3dpac%26pag%3ddis%26ItemID%
3d106520%26wf%3d1 (last visited Oct. 12, 2016).

1    clinics, and hospitals to provide outsourced and offsite radiological services. For instance,

2    FastMed Urgent Care Centers, with dozens of locations across North Carolina, Texas,

3    and Arizona, has partnered with Strategic Imaging for its patients' radiological analysis.

4    A patient with a suspected broken foot would visit a FastMed location, have an x-ray

5    taken, and a Strategic Imaging radiologist would analyze the image remotely using

6    Radlink's software.

7         13.    To facilitate remote diagnosis, Radlink creates and maintains systems

8    where radiologists can access detailed records of patients' radiological charts and other

9    medical information. Some of these systems are further connected to the internet and act

10   as portals into Radlink's patient data repositories.

11        14.    The systems Radlink has implemented include WebPro and BackupMgr

12   (i.e., back up manager). Some of Radlink's web portals are publicly available at the

13   addresses: 66.117.1.108:8080/radlink, 74.124.206.77/radlink,

14   https://radlink.strategicimagingmd.com:8443/radlink/, and

15   https://radlink.strategicimagingmd.com:8443/backupmgr/. On these portals, Radlink

16   maintains patients' confidential medical information in electronic storage.

17        15.    Moreover, Radlink's customers, such as Chow Hip and Knee, Strategic

18   Imaging and FastMed, are covered entities under the Healthcare Insurance Portability and

19   Accountability Act ("HIPAA"), which regulates the privacy of patient information.[2] As

20   such, Radlink is a "Business Associate" because it is "a [corporation] who: (i) On behalf

21   of [a] covered entity or of an organized health care arrangement … creates, receives,

22   _____

23   [2]      45 C.F.R. § 160.103.

maintains, or transmits protected health information for a function or activity regulated by this subchapter, including ... data analysis [and] processing"[3] and must comply with HIPAA regulations.

16.     Moreover, Radlink regularly receives, maintains, and transmits "Protected Health Information", which HIPAA defines as information that is transmitted or maintained in any form or medium, including:

> a subset of health information, including demographic information collected from an individual, and: (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and (i) That identifies the individual; or (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.[4]

17.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the United States Department of Health and Human Services create rules to streamline the standards for handling Protected Health Information, like the data maintained on Radlink's websites.

18.     These regulations state that "[a] covered entity or business associate must comply with the applicable standards, implementation specifications, and requirements of this subpart with respect to electronic protected health information of a covered entity."[5]

19.     Radlink recognizes that the patient information it maintains is HIPAA Protected Health information and that it must comply with HIPAA. In its advertising and

---

[3]     45 C.F.R. § 160.103.
[4]     *Id.*
[5]     45 C.F.R. § 164.302.

1  marketing, Radlink highlights that its technology is advanced but still HIPAA compliant,

2  stating that "all digital images [are] stored in a secure, HIPAA compliant database for

3  future access."[6] And, that "[Radlink's] system is highly fault tolerant with a redundant

4  hardware and software configuration, along with automatic backup and disaster recovery

5  for HIPAA compliance. It comes with 2 terabytes of storage (5 years of images for a

6  typical practice) and is scalable to 20 terabytes. Because our system is tied to the web,

7  images can be accessed remotely by any radiologist of your choosing."[7]

8      20.     Despite making the above compliance promises (and being obligated under

9  law), Radlink does not keep patients' confidential medical information confidential.

10  **II.     Radlink Has Exposed Patients' Confidential Medical Information Without
         Authorization.**

11      21.     Although Radlink represents that it is committed to maintaining patient

12  privacy, it has exposed the confidential medical information of thousands of patients on

13  its web portals. Specifically, Radlink's network connected patient radiological portals,

14  which contain patient medical, and radiological information ("Portals"), lack basic and

15  fundamental security safeguards and are vulnerable to cyber security attacks and further

16  release of confidential medical information. And a review of Defendant's public websites

17  reveals that hackers are presently controlling Defendant's servers—if patient data hasn't

18  already been breached, it is only a matter of time until it is.

19

20  [6] *Radlink Introduces New Family of Digital Imaging Products*,
    http://www.prnewswire.com/news-releases/radlink-introduces-new-family-of-digital-

21  imaging-products-59870172.html (last visited Oct. 12, 2016).
    [7] *PACS Solutions – Radlink Inc.*,

22  http://www.radlink.com/index.php/products/software/pacs-solutions/ (last visited Oct. 12,
    2016).

23

7

*A.    Radlink's Portals Store Patients' Confidential Medical Information.*

22.    Through its portals, Radlink allows physicians and clinical staff to access patients' medical and radiological information. Defendant Radlink owns and operates the websites 66.117.1.108:8080/radlink, 74.124.206.77:8080/radlink, https://radlink.strategicimagingmd.com:8443/radlink, https://hipandpelvis.radlink.com:8443/radlink, https://74.124.206.53/radlink, http://oar.radlink.com:8080/radlink/, https://chowhipandknee.radlink.com:8443/radlink, https://74.124.206.75:8443/radlink, and https://svr.radlink.com:8443/radlink where it provides access to its Portals. Physicians and clinical staff seeking access to patient medical and radiological records use an internet browser (i.e., Google Chrome or Mozilla Firefox) to navigate to a Portal address (e.g., 66.117.1.108:8080/radlink). Once at that website, Defendant's servers load a login prompt where authorized users (e.g., physicians) are required to enter their usernames and passwords to proceed. *See* Figure 1.



(Figure 1.)

23. Upon entering a valid username and password, Defendant's systems will present them with ability to view medical information for all listed patients:



(**Figure 2**, showing a screenshot from Defendant's manual for its portals which is populated with sample patient information)

24. When a physician selects a specific patient, Defendant's systems shows more detailed information:

(**Figure 3**, same with sample radiological data.)

25.     The Portal also stores detailed medical records, such as the patients' demographic information, "reason for study," "history," and more:



(**Figure 4**, same for data types stored in portals)

26.     Defendant maintains such copious and detailed patient medical information because, as Defendant describes in one its product guides, the Portals are integrated into physicians' and clinics' medical systems (i.e., the "Local Area Network"). Through this integration, Defendant's Portals facilitate internet access to the same medical records available in the physicians' or clinics' office:



**Pro Image Total Solution Layout**

(**Figure 5**, showing the Portals circled in red.)

27.     Defendant's Portals, though, do not limit access to only individuals with

valid usernames and passwords. Instead, hackers can breach the Portals with impunity

because Defendant has improperly configured its servers and left them running out-of-

date software. A review of the publically available specifications of Defendant's Portals

show that they run on decade-old software and have not been updated with critical

security patches and, incredibly, are currently being hacked.

    B.     *Radlink's Portals leave patients' confidential medical information exposed.*

28.     Defendant's Portals suffer from two glaring vulnerabilities. First, the

Portals run on an outdated version of a software, called JBoss, that allows hackers to

bypass authentication. Second, Defendant has improperly configured its web systems

and, as a result, its systems leak sensitive and confidential information *before* any authentication is attempted. Worse, public information indicates that Defendant's servers themselves (as opposed to patient data) have already been compromised.

        1.   The JBoss Vulnerability

     29.   Defendant's Portals are built on "JBoss Application Servers" which implement Java (a virtual computing language) for applications. By using Java, service providers are able to let users run applications on myriad devices without having to rewrite the application for each type of device (*e.g.*, a single Java application can run on a Mac and a PC without modification).

     30.   Radlink's implementations of JBoss are woefully out-of-date and suffer from a critical vulnerability (the "JBoss Vulnerability"). Defendant's JBoss systems are listed as running version 4.2.2. A review of industry literature reveals that that version of JBoss was introduced in 2005 and is listed as "End of Life," or, no longer supported or recommended for use. For comparison, the latest version of JBoss (now called WildFly) is version 10.

     31.   In September 2013, the National Institute of Standards and Technology, sponsored by the Department of Homeland Security, updated its National Vulnerability Database to include a vulnerability specific to this version of JBoss. NIST reported that the vulnerability was "network exploitable," had a "low" level of access complexity, and that it "[a]llows unauthorized disclosure of information; [a]llows unauthorized

modification; [and a]llows disruption of service."[8] That is, JBoss version 4.2.2 allows hackers to access previously protected information with little to no effort.[9]

32.    The risk of this vulnerability is not just theoretical. Computer security experts have recently observed an ongoing and "widespread campaign" attacking JBoss computer systems of the exact type used by Defendant.[10] In these attacks, "[a]dversaries are exploiting known vulnerabilities in unpatched JBoss servers [just like Defendant's out-of-date servers] before installing [malicious software], identifying further network connected systems, and installing SamSam ransomware to encrypt files on these devices." That is, hackers are targeting entities that have not updated their JBoss servers and then holding sensitive data hostage until a ransom is paid.

33.    On April 4, 2016, a user commented about this attack with the following:

> We were hit by this ransomware and I wasn't sure if it was jboss related or
> a compromised user account. Good to at least know it was jboss related.
> We had port 443 open to the world on an aging server[11]

That user, just like Radlink, ran an outdated server that was exposed to the internet ("port 443 open to the world") and was attacked.

34.    Earlier this year, the technical publication Ars Technica also reported on

---

[8]    *NVD – Detail*, https://web.nvd.nist.gov/view/vuln/detail?vulnId=CVE-2013-4810 (last visited Oct. 12, 2016); *see also Does CVE-2013-4810 affect Red Hat JBoss products? - Red Hat Customer Portal*, https://access.redhat.com/articles/545183 (last visited Oct. 12, 2016); https://access.redhat.com/solutions/30744 (last visited Oct. 12, 2016).

[9]    Specifically, Radlink's JBoss implementation has been misconfigured in a way that users can access the "JMXInvokerServlet" and "EJBInvokerServlet" JBoss "servlets" (i.e., server interfaces) without authorization.

[10]    *Cisco Talos Blog: SamSam: The Doctor Will See You, After He Pays The Ransom*, http://blog.talosintel.com/2016/03/samsam-ransomware.html?m=1 (last visited Oct. 12, 2016).

[11]    *Id.*

the exploitation of the JBoss vulnerability:

> … a number of health providers have been infected recently through Web servers running JBoss.
>
> …
>
> The malware, called "Samsam" by Talos, uses old, very public exploits right out of JexBoss—an open source vulnerability testing tool for JBoss. Once the malware has a foothold on the server, it spreads to Windows machines on the same network.
>
> ….
>
> Of the "couple of dozen targets" … a significant number of them are healthcare organizations. This is likely not because the attackers set out to target healthcare specifically, but because of the types of applications used by hospitals and healthcare networks. Wilson believes that the ransomware developer simply scanned for vulnerable servers on the Internet, and most of the ones that were discovered were at healthcare organizations.
>
> "A lot of people in the healthcare industry—they set up websites in a kind of fire and forget fashion," Wilson explained. "They hire an IT guy, they get the billing system set up, hook it up to the website and then they never touch it again. That's the perfect environment for this type of malware to thrive in because it's not maintained. They have no full-time security staff and few if any fulltime administrators. As a result, the software just goes unpatched."[12]

35.     Unfortunately, Defendant continues to operate its implementation of JBoss unpatched. And, as a result, Defendant has been releasing the sensitive and confidential medical information of thousands of consumers. Worse, further review of Defendant's public webpages reveals that it also releases sensitive cyber security information even prior to a user's attempt to log in.

---

[12]     *Two more healthcare networks caught up in outbreak of hospital ransomware | Ars Technica*, http://arstechnica.com/security/2016/03/two-more-healthcare-networks-caught-up-in-outbreak-of-hospital-ransomware/ (last visited Oct. 12, 2016).

## 2. Defendant Leaks Credentials Prior to Authentication

36. As introduced above, Defendant has improperly configured its systems and, as a result, leaks sensitive cyber security information. When users initially visit Defendant's portals, their internet browser (e.g., Safari or Chrome) will display the login screen shown in Figure 1. However, behind the scenes, Defendant's servers send additional information to the user's browser even though most users are ignorant of its existence. To hackers and malicious users, though, this information is a treasure trove because it reveals details about Defendant's cyber security measures (or lack thereof).

37. For instance, on an initial visit, Defendant leaks the following information, described in its user guides as relating to the "PACS Server Setting"[13]:

```
HTTP/1.1 200 OK

Server: Apache-Coyote/1.1

X-Powered-By: Servlet 2.4; JBoss-4.2.2.GA (build: SVNTag=JBoss_4_2_2_GA date=200710221139)/Tomcat-5.5

Content-Disposition: attachment

Content-Type: application/json;charset=utf-8

Content-Length: 1542

Date: Tue, 14 Jun 2016 18:17:26 GMT

Connection: close

//OK[4,11112,'h',0,51,4,50,2,4,104,'g',49,5,4,48,2,4,11566,'f',0,15,4,47,2,4,11565,'e',0,15,4,46,2,4,11559,'d',0,15,45,44,2,4,11555,'c',0,15,4,43,2,4,11553,'b',0,15,4,42,2,4,13494,'a',41,15,4,40,2,4,13494,'Z',38,15,4,39,2,4,13494,'Y',38,15,4,37,2,4,13494,'X',36,15,4,35,2,4,11112,'W',0,34,4,33,2,4,11541,'V',0,15,4,32,2,4,11535,'U',0,15,4,31,2,4,13496,'T',0,15,30,29,2,4,104,'S',0,28,4,27,2,4,11112,'R',0,26,4,25,2,4,13494,'Q',0,5,4,24,2,4,11114,'P',0,11,4,23,2,4,11114,'O',0,22,4,21,2,4,11504,'N',0,15,4,20,2,4,11114,'M',0,19,4,18,2,4,11114,'L',0,9,4,17,2,4,11563,'K',0,15,4,16,2,4,11562,'J',0,15,14,13,2,4,11115,'I',0,5,4,12,2,4,105,'H',0,11,4,10,2,4,105,'G',0,9,4,8,2,4,104,'F',0,7,4,6,2,4,11112,'D',0,5,4,3,2,30,1,["java.util.Vector/312 5574444","com.radlink.viewer.client.AE/3781500419","sicclaudpacs","","localhost","homews","192.168.101.109","wspc","192.168.101.102","faraoklws","10.200.233.156","test","mammopc_dcmsrv","Office Workstation","74.124.206.52","farooki_dcmsrv","wspc_dcmsrv","aghera_dcmsrv","10.200.234.150","wspc_dcmsrv.tmp","lomis_dcmsrv","192.168.1.124","farooki_dcmsrv.norm","huchun_dcmsrv","fastmedpacs","10.10.1.11","CS2-2535","192.168.1.51","pacs103","PACS 103 Test Node at 168.93","dougherty_dcmsrv","fox_dcmsrv","proimagepacs","72.27.224.194","ULTRA_ARCHIVE","Alliance Urgent Care","PUC_Corinth","PUC Corinth","Mindray M5","PUC-Booneville","PUC Booneville","dcmsrv_keshad","sarangi_dcmsrv","dsrvdcm","Dougherty PC 02","greg_dcmsrv","jeolebk_dcmsrv","FPMTNCOLCR01","fpCollinwood","sicpacstemp","108.61.149.162"],0,6]
```

(Figure 6.)

38. Beyond the PACS Server Settings, Defendant releases sensitive cyber security information that Defendant describes as its customers' access groups and the

---

[13]     ThinPACS at 14.

functions they can execute, such as opening a "Preliminary report entered by clinician":

" id=\"10\"/>\n  <SecurityCode name=\"SCCENTRALDOC\" desc=\"Workflow: sc=\"Preliminary report entered by clinician\" id=\"100\"/>\n  <State \"200\" />\n  <State name=\"FINALIZED+ADDENDUM\" desc=\"\" id=\"300\"  <Step state=\"ARRIVED\" >\n    <Action name=\"Report\" Code=\"SCLOCALDOC\">\n\t  <Command name=\"SAVEREPORT\"

(**Figure 7**, revealing the "SecurityCode" information leaked by Defendant.)

39.  In other places, Defendant discloses sensitive email addresses and passwords:

HTTP/1.1 200 OK

Server: Apache-Coyote/1.1

X-Powered-By: Servlet 2.4; JBoss-4.2.2.GA (build: SVNTag=JBoss_4_2_2_GA date=200710221139)/Tomcat-5.5

Content-Disposition: attachment

Content-Type: application/json;charset=utf-8

Content-Length: 178

Date: Tue, 14 Jun 2016 18:17:26 GMT

Connection: close

//OK[0,0,0,7,0,6,0,0,0,0,0,0,0,0,2,5,4,3,2,0,0,0,1,["com.radlink.viewer.client.Setting/1963474802","eradlink@gmail.com","1234eradlink5678"," y","smtp.gmail.com","8100","n"],0,6]

(**Figure 8.**)

40.  By using the sensitive email address and password shown in Figure 8, hackers can likely access Defendant's confidential communications and worse. For

instance, anyone with Defendant's email credentials can navigate to www.gmail.com and

log into Defendant's email. Therein, the unauthorized user has access to emails, contact

lists, notes, and documents, and, importantly, is able to impersonate Defendant and to

obtain additional confidential information from clients and patients.

### 3. Defendant's Servers Have Already Been Compromised

41. Beyond the two persistent vulnerabilities, public information indicates that

Defendant's servers have been hacked. Importantly, while Defendant's servers have

already been compromised, it is possible that patient data has not yet been breached.

Nevertheless, the longer Defendant is allowed to operate impaired servers, the greater

chance there is for a data breach or physical harm to patients.

42. On several of Defendant's public portals, such as 74.124.206.77:8080,

information reveals that hackers have begun exploiting Defendant's servers. For instance,

it can be seen that a nefarious user has installed on the server (presumably without

authorization) the "JexBoss Exploit Tool" malware, amongst others. *See* Figure 9.



(**Figure 9**.)

43.     Indeed, it even appears that an unauthorized user installed a "shell" (i.e., a method to control a server's resources) on Defendant's servers. As Figure 10 demonstrates, a hacker (or hackers) has installed myriad unauthorized applications onto Defendant's servers.

**Application list**

```
localhost/
localhost/jbossass
localhost/jexinv3
localhost/jexws3
localhost/is
localhost/web-console
localhost/jbossws
localhost/radlink
localhost/sha
localhost/chao
localhost/tomandjack
localhost/shellinvoker
localhost/wado
localhost/invoker
localhost/radlinkqc
localhost/vs
localhost/rid
localhost/backupmgr
localhost/dcm4chee-arr
```

(**Figure 10**, showing Defendant's compromised server with the "JexBoss" malware installed, amongst others.)

44.     Despite possessing knowledge that Defendant is having its servers ostensibly hacked, only Defendant knows if confidential patient data has been breached. If Defendant continues to operate its compromised systems, though, it is almost a certainty that patient data (or health) will be breached. Radlink's compromised systems demonstrate why vulnerabilities like the ones Radlink has on its Portals often serve as the entry point to other sensitive and potentially vulnerable systems. As Radlink itself describes, and as shown in Figure 5, reproduced below, Radlink's portals and devices are meant to be interconnected to other systems:



**(Figure 5**, reproduced.)

45.     And, because Radlink's devices exist in physicians' offices and clinics, there undoubtedly exist a host of connected medical devices on the same network that may be vulnerable to hackers, including MRI machines[14], drug infusion machines[15], and robotic surgical equipment[16]. Each of those systems might suffer from their own

---

[14]     *Medical devices could be lethal in hands of hackers | TheHill,* http://thehill.com/policy/cybersecurity/271003-medical-devices-could-be-lethal-in-hands-of-hackers (last visited Oct. 12, 2016) (stating that "Hackers could disable a certain commonly used piece of equipment, like an MRI machine, effectively withholding needed care.")

[15]     *Medical Devices That Are Vulnerable to Life-Threatening Hacks | WIRED,* https://www.wired.com/2015/11/medical-devices-that-are-vulnerable-to-life-threatening-hacks/#slide-1 (last visited Oct. 12, 2016) (noting that researchers "found vulnerabilities in the pump that would allow a hacker to surreptitiously and remotely change the amount of drugs administered to patients to deliver a deadly dosage.")

[16]     *Telesurgery Vulnerable to Remote Hacks, Hijacks,* https://blog.kaspersky.com/hacking-robotic-surgeons/8570/ (last visited Oct. 12, 2016)

vulnerabilities (or may not be protected by any mechanism at all) and if a hacker gains further access to Radlink's system, he or she might access a physician's or clinic's internal network to tamper with at-risk patients and the delivery of vital medical care.

46. Bloomberg Business recently conducted in-depth reporting on the threat presented by weak security in medical devices, including radiological machines like Radlink's, and reported the following:

> In several cases, the hackers "spear phished" hospital staffers, luring them into opening e-mails that appeared to come from senders they knew, which infected hospital computers when they fell for the bait. In one case, hackers penetrated the computer at a nurses' station, and from there the malware spread throughout the network, eventually slipping into radiological machines, blood gas analyzers, and other devices. Many of the machines ran on cheap, antiquated operating systems, such as Windows XP and even Windows 2000. The hospital's antivirus protections quickly scrubbed the computer at the nurses' station, but the medical devices weren't so well guarded.

> Many of the hospitals that participated in the study rely on the device manufacturers [e.g., Radlink] to maintain security on the machines, says Carl Wright, general manager for TrapX. That service is often sporadic, he says, and tends to be reactive rather than preventive. "These medical devices aren't presenting any indication or warning to the provider that someone is attacking it, and they can't defend themselves at all," says Wright, who is a former information security officer for the U.S. military.

> After hackers had compromised a medical device in a hospital, they lurked there, using the machine as a permanent base from which to probe the hospital network. Their goal, according to Wright, was to steal personal medical data.[17]

47. The Vulnerabilities present on Radlink's systems are the low-hanging-fruit of the cyber security world: they are easy to find and simple to exploit. As such, given the

(stating that "A group of academic security researchers remotely hacked and took control of a robot designed to perform telesurgery.")

[17] *Hospital Gear Could Save Your Life Or Hack Your Identity - Bloomberg Business*, http://www.bloomberg.com/features/2015-hospital-hack/ (last visited Oct. 12, 2016).

fact that a hacker has already discovered Radlink's vulnerable system, it is only a matter of time until they further expose patients' confidential medical information (if they haven't already). The consequences of Defendant's failure to adequately secure patients' confidential medical information cannot be overstated: with only minimal effort, a hacker can gain access to an immense amount of confidential medical data. Worse, it may be possible for the hacker to edit or delete confidential patient information, putting patients' health and safety at high risk from a missed or deleted diagnosis.

C.   *Radlink ignores industry standards, leaving patients' confidential medical information exposed.*

48.   If Radlink were to follow industry standards, patients' confidential medical and radiological information would not be exposed. Industry standard practices (and common sense) dictate that only verified users (e.g., physicians and medical personnel) should be granted access to patients' confidential medical and radiological information and that all others should be prohibited from accessing that information. Myriad methods exist to ensure that does not happen on even the most basic of websites and services. For websites that maintain sensitive information, such as medical records, there exist governmental organizations, industry groups, and others that recognize the heightened demand for security and, as such, outline protocols to ensure data integrity.

49.   Broadly speaking, by exposing patients' confidential health information, Radlink has failed to implement industry standard user verification techniques and data security as required by federal law, among other things. More specifically, Radlink:

a.   Fails to maintain an adequate data security system to prevent data breaches;

b.     Fails to mitigate the risks of a data breach and unauthorized access to protected health information;

c.     Fails to encrypt or otherwise protect Plaintiff's and the Class's protected health information;

d.     Fails to ensure the confidentiality and integrity of electronic protected health information it created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

e.     Fails to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.     Fails to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g.     Fails to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2);

h.     Fails to protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

i.     Fails to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

j.     Fails to effectively train all members of its workforce on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R § 164.530(b); and

k.     Fails to design, implement, and enforce policies and procedures establishing administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. § 164.530(c).

50.     Radlink also fails to comply with industry standards. Over a decade ago, in March 2005, the National Institute of Standards and Technology ("NIST") published a

report detailing standards for healthcare providers seeking to comply with HIPAA's

Security Rule. In the report, NIST recommended specific techniques to safeguard

electronically stored sensitive information. In one example, NIST specifically

recommended that companies use "authentication mechanisms [] to verify the identity of

those accessing systems protected from inappropriate manipulation."[18]

51.     In addition, the United States Department of Health and Human Services

("HHS") has issued many documents to assist covered entities better secure patient data.

In a white paper on "Security Standards: Technical Safeguards," the HHS explains that:

> In general, authentication ensures that a person is in fact who he or she claims to be before being allowed access to [electronic protected health information ("EPHI")]. This is accomplished by providing proof of identity. There are a few basic ways to provide proof of identity for authentication. A covered entity may:
>
> o  Require something known only to that individual, such as a password or PIN.
>
> o  Require something that individuals possess, such as a smart card, a token, or a key.
>
> o  Require something unique to the individual such as a biometric. Examples of biometrics include fingerprints, voice patterns, facial patterns or iris patterns.
>
> Most covered entities use one of the first two methods of authentication. Many small provider offices rely on a password or PIN to authenticate the user. If the authentication credentials entered into an information system match those stored in that system, the user is authenticated. Once properly authenticated, the user is granted the authorized access privileges to perform functions and access EPHI.[19]

52.     Radlink ignores many other long-standing industry protocols, including the

[18]     Matthew School et al., National Institute of Standards and Technology, U.S. Dep't of Commerce, *NIST Special Publication 800-66 Revision 1: An Introductory Resources Guide for Implementing the Health Insurance Portability and Accountability Act (HIPAA) Security Rule* (Oct. 2008), at 23, *available at* http://csrc.nist.gov/publications/nistpubs/800-66-Rev1/SP-800-66-Revision1.pdf.
[19]     Department of Health and Human Services, *HIPAA,* http://www.hhs.gov/ocr/privacy/hipaa/administrative/securityrule/techsafeguards.pdf (last visited Oct. 12, 2016).

1 standard practice of regular auditing and monitoring of systems that protect sensitive

2 information. In 1996, NIST issued the "Principles and Practices for Security IT Systems,"

3 and while many specific technologies have changed since that document's release, the

4 underlying guidelines have stayed the same.[20] For instance, once a system has been

5 deployed, organizations are to conduct "[a] system audit [which] is a one-time or periodic

6 event to evaluate security" and to "monitor[] ... ongoing activity [to] examine[] either the

7 system or the users."[21] One audit specifically mentioned (and used more commonly in the

8 industry today) is "Penetration Testing," which is described as follows:

> Penetration testing can use many methods to attempt a system break-in. In addition to using active automated tools as described above, penetration testing can be done "manually." For many systems, lax procedures or a lack of internal controls on applications are common vulnerabilities that penetration testing can target. Penetration testing is a very powerful technique; it should preferably be conducted with the knowledge and consent of system management.[22]

13     53.    If Radlink conducted even a basic penetration test to look for cyber security

14 weaknesses, it would have uncovered the Vulnerabilities and would have promptly fixed

15 them. The nature of the Vulnerabilities (i.e., that are both caused by misconfigured files

16 and settings) suggests that Radlink's system has been vulnerable since it first

17 implemented the Portals, many years ago. Had Radlink conducted any penetration testing

18 over that time, it would have been alerted that its systems are vulnerable.

19     54.    Besides penetration testing, Radlink does not employ any of the safeguards

---

[20]     U.S. Department of Commerce, Technology Administration, National Institute of Standards and Technology, *Generally Accepted Principles and Practices for Security Information Technology Systems*, 24 (available at http://csrc.nist.gov/publications/nistpubs/800-14/800-14.pdf).
[21]     *Id.*
[22]     *Id.* at 25.

described above despite having reason to know that patient data should be kept confidential: HIPAA and industry-standard protections (which Radlink ignores) exist *specifically* to prevent an unauthorized disclosure or release of patients' confidential medical information and to maintain that data's integrity.

55. Radlink's actions are alarming. Patients both expect and pay for (as a part of their medical payments) the confidentiality of their confidential medical information, but Radlink has disclosed that information. Moreover, Radlink has profited by not allocating necessary resources to keep information confidential (*e.g.*, by implementing industry standard information security).

### III. Patient Medical Information is a Primary Target for Hackers.

56. Patients are not only faced with the present injury of Radlink disclosing their confidential medical information, but the longer Radlink leaves their information in the open and operates compromised systems, the more likely the patients are to become victims of further harm, including identity theft and physical harm from altered medical records.

57. This risk is especially great for Radlink, considering the sensitive type of information with which it has been entrusted. While companies of all sizes are increasingly at risk of having sensitive information stolen, the risk is exacerbated in the medical industry as patients' confidential medical records become digitized. Identity thieves have specifically targeted confidential medical information because that data is more valuable than other types, such as even credit card numbers. As a result, medical organizations and companies that provide services to those organizations have been specifically warned to strengthen security measures.

58.     In a June 2007 report on data theft, the United States Government Accountability Office noted that identity thieves use stolen information to open financial accounts, receive government benefits, and incur charges and open credit in a person's name.[23] As the report states, this type of identity theft is the most harmful because it may take some time for the victim to become aware of the theft, which can adversely impact the victim's credit rating. Victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[24]

59.     Worse, a person whose personal information has been compromised may not see any signs of identity theft for years:

> "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[25]

60.     Stolen medical information is a valuable commodity to identity thieves who often trade the information on cyber black-markets. Indeed, entire online "underground exchanges" have been created "where hackers sell [stolen] information," such as "names, birth dates, policy numbers, diagnosis codes and billing information."[26] On these exchanges, "medical information is worth 10 times more than [] credit card number[s]."[27] One report noted that "[h]ealth insurance credentials are especially valuable in today's economy because health care costs are causing people to seek free medical care with

---

[23]     *See* United States Government Accountability Office, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* www.gao.gov/new.items/d07737.pdf.
[24]     *Id.*
[25]     *Id.*
[26]     *Your medical record is worth more to hackers than your credit card* | *Reuters*, www.reuters.com/article/ 2014/09/24/us-cybersecurity-hospitals-idUSKCN0HJ21I20140924 (last visited  Oct. 12, 2016).
[27]     *Id.*

1 these credentials."[28]

2      61.    Examples of medical data breaches are legion. The U.S. Department of

3 Health and Human Services Office for Civil Rights maintains an up-to-date list of every

4 reported "breach[] of unsecured protected health information affecting 500 or more

5 individuals."[29] At last count, there were over 1,600 reported incidents since October

6 2009—more than one breach every other day.[30] In one recent case, a "niche

7 pharmaceutical company" suffered a breach of "50,000 records" and was being held

8 ransom by a "hacker who [was looking] to sell the data to the highest bidder or back to

9 the company, whichever comes first."[31]

10      62.    In another example from September of 2015, Systema Software, a company

11 that works with physicians and clinics to provide access to patients' medical information

12 over the internet (not unlike Radlink), improperly secured the confidential medical

13 information of approximately 1.5 *million* patients.[32] There, Systema Software apparently

14 failed to implement industry-standard authentication protocols, allowing a "self-described

15 'technology enthusiast'" to breach its systems to access and download patients' "name,

16 Social Security Number, phone number, address," "financial transaction data," and

17

18 [28]    *Why hackers want your health care data most of all | InfoWorld*, www.infoworld.com/article/2983634/ security/why-hackers-want-your-health-care-data-breaches-most-of-all.html (last visited Oct. 12, 2016).

19 [29]    *U.S. Department of Health & Human Services - Office for Civil Rights*, ocrportal.hhs.gov/ocr/breach/ breach_report.jsf (last visited Oct. 12, 2016).

20 [30]    *Id.*
[31]    *Akorn Inc. has customer database stolen, records offered to highest bidder | CSO Online*, www.csoonline.com/article/2938032/data-breach/akorn-inc-has-customer-

21 database-stolen-records-offered-to-highest-bidder.html (last visited Oct. 12, 2016).
[32]    *Oops! Error by Systema Software exposes millions of records with insurance

22 claims data and internal notes (Update2)*, http://www.databreaches.net/oops-error-by-systema-software-exposes-millions-of-records-with-insurance-claims-data-and-internal-notes/ (last visited Oct. 12, 2016).

23

"insurance claim forms with some medical/health information." Had Systema Software implemented basic security features, the breach would have been thwarted. As it stands, the company joins the growing list of companies that have been breached.

63. In fact, the American Bar Association published a book warning companies that store patient data that "[m]assive data breaches are occurring with alarming frequency. An analysis of data breaches by industry should provide a wake-up call for the health care industry."[33] The ABA went on, saying that "[f]ailed security has resulted in massive data breaches that led to the loss or compromise of millions of personally identifiable health care records. … In almost all cases, data breaches that occurred could have been prevented by proper planning and the correct security design and implementation of appropriate security safeguards."[34]

64. As such, companies entrusted with sensitive patient medical information must be vigilant against threats and employ (at a bare-minimum) industry-standard cyber protection. Any cost borne by the company to implement those practices is dwarfed by the cost faced by consumers who are victim to a medical data breach. The "average total cost" of medical identity theft is "about $20,000" per incident, according to a report by Experian, and the majority of victims of medical identity theft are forced to pay out-of-pocket costs for health care they did not receive (*i.e.*, fraudulent medical billing and

---

[33] *Health Care Data Breaches and Information Security*, www.americanbar.org/content/ dam/aba/publications/books/healthcare_data_breaches.authcheckdam.pdf (last visited Oct. 12, 2016).
[34] *Id.*

1   services) just to restore medical or insurance coverage.[35] Indeed, almost half of medical

2   identity theft victims lose their health care coverage as a result of such incidents, nearly

3   one-third will see their insurance premiums rise, and forty percent are likely to never to

4   get closure of their identity theft.[36] Data breaches and identity theft have a crippling

5   effect on individuals and detrimentally impact the entire economy as a whole.

6      65.   Importantly, the disclosure, release, and theft of medical data has effects far

7   beyond money costs, including dangerous physical consequences and reputational harm.

8   In 2014, CBS News reported that "[m]edical identity theft can threaten health as well as

9   bank account[s]."[37] The report went on to state that "15 percent of the medical identity

10  theft victims surveyed reported that the theft had created misinformation in their medical

11  records that led to a misdiagnosis, and 14 percent said they experienced a delay in

12  care."[38] Because of this, "[t]he impact of medical identity theft can be even more dire

13  than financial identity theft."[39]

14     66.   And in a February 2015 study, the Ponemon Institute—a group "dedicated

15  to independent research and education that advances responsible information and privacy

16  management practices within business and government"—reported that "medical identity

17  theft affected [victims'] reputation mainly because of embarrassment due to disclosure of

18

19   [35]   *See* Elinor Mills, *Study: Medical identity theft is costly for victims*,
     news.cnet.com/8301-27080_3-10460902-245.html (last visited Oct. 12, 2016).
     [36]   *Id.*
20   [37]   *Experts say medical identity theft is "low-hanging fruit" for thieves; cite limited
     police attention and lack of record-keeping - CBS News*,
21   http://www.cbsnews.com/news/medical-identity-theft-can-threaten-health-as-well-as-
     bank-account/ (last visited Oct. 12, 2016).
22   [38]   *Id.*
     [39]   *Id.*

23

sensitive personal health conditions."[40] Ponemon went on to report that the leak of that potentially embarrassing personal health information has led victims to "miss out on career opportunities" and lose their jobs.[41]

67.     Given the recognized targeting of patient data by identity thieves, it is no surprise that Defendant servers (which stores the confidential patient data entrusted to Defendant) have already been compromised. Radlink's websites have been operating for months (at least) with the vulnerabilities described here. And because of poor security management and administration, there is a strong chance that Radlink is ignorant of prior or continuing unauthorized access/use stemming from the website vulnerabilities. As a result, if the hackers that have already compromised Defendant's servers have not accessed confidential patient data, it may be only a matter of time until they do.

68.     As such, the only way to protect Plaintiff's and other similarly situated patients' confidential patient data is through an injunction compelling Defendant to immediately disconnect its servers from external networks (*e.g.*, the internet) until it can at least implement basic industry standard protections to keep that information confidential and remove hosted malware, and to allow an independent third-party firm to conduct a security audit of its systems to ensure the integrity of patients' confidential medical information and determine the extent of any data breach that may have already occurred.

[40]     Ponemon Institute, *Fifth Annual Study on Medical Identity Theft*, (Feb. 2015) available at http://medidfraud.org/wp-content/uploads/2015/02/2014_Medical_ID_Theft_Study1.pdf
[41]     *Id.*

## PLAINTIFF SCHRECKER'S EXPERIENCE

69.    Plaintiff Schrecker has been a patient at facilities using Radlink medical devices, including a FastMed location in Tucson, Arizona. During at least some of those visits, Plaintiff received x-ray's, and as a result, FastMed created electronic records of Plaintiff's visits that are and were accessible through Radlink's systems. Plaintiff paid (directly through deductibles and/or copays and indirectly through his insurance premiums) for the medical care he received.

70.    Plaintiff paid for the medical care he received because he had the reasonable expectation that FastMed and its business associates, including Radlink, were keeping his medical information confidential. Moreover, Plaintiff understood and expected that companies entrusted with confidential medical information are required by law (*e.g.*, HIPAA) to use industry standard security protections to safeguard the data and keep it confidential. Plaintiff values the privacy of his confidential medical information and avoids doing business with companies with lax data security protocols.

## CLASS ALLEGATIONS

71.    **Class Definitions:** Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), and (b)(3) on behalf of himself and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who have their medical information stored electronically by Defendant.

> The following persons are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or

its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

72.     **Numerosity:** On information and belief, tens of thousands of consumers fall into the Class definition. Members of the Class can be identified through Defendant's records.

73.     **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class and, pursuant to Fed. R. Civ. P. 23(b)(3), predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

(a)     Whether the hackers who have compromised Defendant's servers have breached patients' confidential medical information;

(b)     Whether Radlink has disclosed or released patients' confidential medical information;

(c)     Whether Radlink fails to adequately secure patients' confidential medical information;

(d)     Whether Radlink has been unjustly enriched;

(e)     Whether Radlink has violated the California Confidential Medical Information Act;

(f)     Whether Radlink has violated the California's Unfair Competition Law; and

1        (g)     Whether Plaintiff and the Class are entitled to a permanent

2                 injunction to protect their confidential medical information.

3     74.   **Typicality**: Plaintiff's claims are typical of the claims of other members of

4 the Class, in that Plaintiff and the members of the Class continuously sustain injury

5 arising out of Defendant's wrongful conduct.

6     75.   **Adequate Representation:** Plaintiff will fairly and adequately represent

7 and protect the interests of the Class and has retained counsel competent and experienced

8 in complex litigation and class actions. Plaintiff's claims are representative of the claims

9 of the other members of the Class. That is, Plaintiff and the Class members each have

10 their confidential medical information insecurely stored on Defendant's servers and

11 require an injunction to safeguard their data and have paid for Radlink's services with a

12 portion of each payment to be uses for the administrative costs of data management and

13 security. Plaintiff also has no interests antagonistic to those of the Class, and Defendant

14 has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously

15 prosecuting this action on behalf of the members of the Class, and have the financial

16 resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the

17 Class.

18     76.   **Policies Generally Applicable to the Class**: This class action is

19 appropriate for certification because Defendant has acted or refused to act on grounds

20 generally applicable to the Class as a whole, thereby requiring the Court's imposition of

21 uniform relief to ensure compatible standards of conduct toward the members of the

22 Class and making final injunctive relief appropriate with respect to the Class as a whole.

23 Defendant's policies that Plaintiff challenges apply and affect members of the Class

uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff. The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class are the same.

77. **Separate Suits Would Create Risk of Varying Conduct Requirements**: The prosecution of separate actions by members of the Class against Radlink would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct. Certification is therefore proper under Fed. R. Civ. P. 23(b)(1).

78. **Appropriateness of Injunctive Relief**: Pursuant to Fed. R. Civ. P. 23(b)(2), Defendant has acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole. Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendant.

79. **Superiority**: This case is also appropriate for certification, pursuant to Fed. R. Civ. P. 23(b)(3), because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of individual prosecution of litigation to redress Defendant's actions. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class

action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

80.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

## COUNT I
### Unjust Enrichment
### (On behalf of Plaintiff and the Class)

81.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

82.     Plaintiff and members of the Class conferred a measurable monetary benefit on Defendant. Defendant received and retained money belonging to Plaintiff and the Class in the form of a portion of the medical fees paid to Defendant. Plaintiff paid FastMed for his radiological services and, as a result of the direct relationship between FastMed and Defendant, a portion of his payment was transferred to Defendant.

83.     Defendant appreciates or has knowledge of such benefit.

84.     A portion of the medical fees that Plaintiff and the Class paid to Defendant was to be used by Defendant, in part, to pay for the administrative costs of data management and security (*i.e.*, to keep their confidential medical information confidential).

1    85.    Under principles of equity and good conscience, Defendant should not be

2  permitted to retain the money belonging to Plaintiff and members of the Class. Defendant

3  has failed to keep Plaintiff's and Class members' confidential medical information

4  confidential and to implement industry standard data management and security measures

5  to secure patients' confidential medical information, and under such circumstances,

6  Defendant's retention of the benefit without payment would be unjust.

7    86.    Accordingly, Defendant has received money from Plaintiff and the Class

8  through the unlawful practices alleged herein, which in equity and good conscience

9  should be returned.

10                              **COUNT II**
       **Violation of the California Confidential Medical Information Act**
11                  **(On behalf of Plaintiff and the Class)**

12    87.    Plaintiff incorporates by reference the foregoing allegations as if fully set

13  forth herein.

14    88.    California's Confidential Medical Information Act ("CMIA") was enacted

15  to protect against the unauthorized release or disclosure of confidential medical

16  information. The CMIA prohibits entities from negligently disclosing or releasing any

17  person's confidential medical information.

18    89.    Defendant is a "contractor" as defined by Cal. Civ. Code § 56.05 (d)

19  because it is a "medical group, independent practice association, pharmaceutical benefits

20  manager, or a medical service organization and is not a health care service plan or

21  provider of health care."

22    90.    Plaintiff and members of the Class are "patients" as defined by Cal. Civil

23  Code § 56.05 (k).

91.     Defendant has negligently maintained confidential medical information by continuing to operate a misconfigured and out-of-date computer system, failing to implement adequate security protocols to prevent unauthorized access to confidential medical information, failing to maintain an adequate electronic security system to prevent data breaches, and failing to employ industry standard and commercially viable measures to mitigate the risks of any data breach or otherwise comply with HIPAA data security requirements.

92.     As a result of Defendant's negligent actions, Defendant has disclosed, released, and otherwise allowed unauthorized third parties (i.e., the malicious actors who installed malware on and control Defendant's servers) access to Plaintiff's and the Class members' confidential medical information. Given the totality of the circumstances—that Defendant's websites providing access to confidential medical information are vulnerable, its systems are being hacked, and confidential medical information is prized by hackers—these allegations will likely have evidentiary support after a reasonable opportunity for further investigation or discovery (e.g., a review of the server logs and records exclusively in Defendant's control).

93.     As a direct and proximate result of Defendant's negligence, it continues to disclose and release Plaintiff's and the Class members' confidential medical information. As described in the complaint, the confidential medical information released by Defendant is "individually identifiable" as defined by Cal. Civ. Code § 56.05 (j) because "medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other

information that, alone or in combination with other publicly available information, reveals the individual's identity." *See* Figure 4.

94.     Defendant's disclosure or release of confidential medical information is presently occurring entirely in the State of California. Defendant maintains its servers in California, and, as a result, any time Plaintiff and members of the Class receive care in states other than California Defendant completes each transaction in the State of California.

95.     Plaintiff and the Class never provided Defendant with authorization to disclose or release their confidential medical information in the manner described above.

96.     Accordingly, Plaintiff, on behalf of himself and members of the Class, seek to recover actual, nominal (including $1,000 nominal damages per release, under § 56.36 (b)(1)), and statutory damages (including $2,500 per disclosure under § 56.36 (c)) where applicable, together with reasonable attorneys' fees and costs.

**COUNT III**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(On behalf of Plaintiff and the Class)**

97.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

98.     California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

99.     The UCL prohibits any unlawful, unfair, or fraudulent business act or practice, including the employment of any deception, fraud, false pretense, false promise,

1  misrepresentation, or the concealment, suppression, or omission of any material fact. A

2  business practice need only meet one of the three criteria to be considered unfair

3  competition.

4  100.   Plaintiff and members of the Class received medical care and radiological

5  services. As a part of those services, electronic medical records were transmitted to

6  Defendant in California. As such, Defendant has collected and presently maintains

7  Plaintiff's and the Class members' confidential medical information on its servers in

8  California. Moreover, Defendant is exposing Plaintiff's and the Class's confidential

9  medical information from its servers in California.

10  101.   Defendant has violated the UCL by:

11  a.      Engaging in deceptive and fraudulent acts and practices by

12  representing and advertising that it would maintain adequate data privacy and security

13  practices and procedures to safeguard Plaintiff's and Class members' confidential

14  medical information from unauthorized disclosure, release, data breaches, and theft; and

15  representing and advertising that it does and would comply with the requirements of

16  relevant federal and state laws pertaining to the privacy and security of confidential

17  medical information;

18  b.      Engaging in deceptive and fraudulent acts and practices by omitting,

19  suppressing, and concealing the material fact of the inadequacy of the privacy and

20  security protections for Plaintiff's and the Class's confidential medical information.

21  Before and at the time that Class members were seeking medical care, Defendant failed

22  to disclose to its clients (e.g., physicians, clinics, and radiologists) that its systems were

23  out-of-date and vulnerable. Had Defendant disclosed that information to its clients,

1   Plaintiff and the Class would not have had to use Defendant's systems and their

2   confidential medical information would not have been exposed (i.e., physicians and

3   clinics would not have knowingly used Defendant's vulnerable systems);

4           c.      Engaging in unfair acts and practices by establishing the sub-

5   standard security practices and procedures described herein; by soliciting and collecting

6   Plaintiff's and Class's confidential medical information with knowledge that the

7   information would not be adequately protected; and by storing Plaintiff's and the Class's

8   confidential medical information in an unsecure electronic environment. These unfair

9   acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable,

10  and/or substantially injurious to Plaintiff and the Class. Defendant's practice was also

11  contrary to legislatively declared and public policies that seek to protect consumer data

12  and ensure that entities who solicit or are entrusted with personal data utilize appropriate

13  security measures, as reflected by laws like the Federal Trade Commission Act (15

14  U.S.C. § 45), HIPAA (42 U.S.C. § 1302d *et seq.*), the Gramm-Leach-Bliley Act (15

15  U.S.C. § 6801), and California's Confidentiality of Medical Information Act (Civil Code

16  §56 *et seq.*). The harm these practices caused (and continues to cause) to Plaintiff and

17  members of the Class outweighed their utility, if any;

18          d.      Engaging in unfair acts and practices with respect to the sale and

19  operation of its medical devices by failing to disclose that its services were vulnerable.

20  These unfair acts and practices were immoral, unethical, oppressive, unscrupulous,

21  unconscionable, and/or substantially injurious to Plaintiff and members of the Class. The

22  harm these practices caused (and continues to cause) to Plaintiff and the Class

23  outweighed their utility, if any;

1        e.      Engaging in unlawful business practices by violating the privacy and

2 security requirements of HIPAA (42 U.S.C. § 1302d *et seq.*); and

3        f.       Engaging in unlawful business practices by violating California's

4 Confidentiality of Medical Information Act (Civil Code §56 *et seq.*).

5      102.    As a direct and proximate result of Defendant's unfair and unlawful

6 practices and acts, Plaintiff and members of the Class were injured and lost money or

7 property, including but not limited to the premiums, copays, and/or money received by

8 Defendant for the radiological services and the loss of their legally protected interest in

9 the confidentiality and privacy of their confidential medical information.

10     103.    Defendant knows or should know that its computer systems and data

11 security practices are inadequate to safeguard Plaintiff's and Class members' confidential

12 medical information. Defendant's actions in engaging in the above-named unfair

13 practices and deceptive acts are negligent, knowing and willful, and/or wanton and

14 reckless with respect to the rights of Plaintiff and members of the Class.

15     104.    Plaintiff and members of the Class seek relief under Cal. Bus. & Prof. Code

16 § 17200, et. seq., including, but not limited to, restitution to Plaintiff and Class members

17 of money or property that the Defendant may have acquired by means of Defendant's

18 deceptive, unlawful, and unfair business practices, restitutionary disgorgement of all

19 profits accruing to Defendant because of its unlawful and unfair business practices,

20 declaratory relief, attorney's fees and costs (pursuant to Cal. Code Civil Pro. §1021.5),

21 and injunctive or other equitable relief.

22

23

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Christian Schrecker, on behalf of himself and members of the Class, prays for the following relief:

a.    A preliminary injunction:

      i.    requiring Defendant to disconnect its vulnerable and compromised servers from external networks (*e.g.*, the internet) until it can implement industry standard procedures to make Plaintiff's and the Class's confidential medical information confidential;

      ii.    requiring Defendant to inform patients who have their confidential medical information accessible on Defendant's websites that they face a threat of further unauthorized disclosure or release due to Defendant's substandard security measures; and

      iii.    compelling Defendant to allow an independent third-party firm to conduct a security audit of its systems to ensure the confidentiality and integrity of patients' confidential medical information and determine the extent of any data breach that may have already occurred.

b.    An order certifying this case as a class action on behalf of the Class defined above, appointing Christian Schrecker as representative of the Class, and appointing his counsel as class counsel; and,

c.    An order:

      i.    Declaring that Defendant's conduct, as set out above, constitutes unjust enrichment and violations of California's Confidential

Medical Information Act and Unfair Competition Law, and making

the preliminary injunction permanent;

ii.  Awarding reasonable attorney's fees and expenses;

iii.  Awarding pre- and post-judgment interest, to the extent allowable; and,

iv.  Awarding such other and further relief as equity and justice may

require.

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully Submitted,
**CHRISTIAN SCHRECKER**, individually and
on behalf of all others similarly situated,

Dated: October 13, 2016        By: _____
One of Plaintiff's Attorneys

John E. Kelly
john@klawteam.com
Kelly Law Team
1 E Washington Street, Suite 500
Phoenix, Arizona 85004-2558
Tel: 602.283.4122
Fax: 602.281.6885

Rafey S. Balabanian*
rbalabanian@edelson.com
Eve-Lynn J. Rapp*
erapp@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Benjamin S. Thomassen*
bthomassen@edelson.com

EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Pro hac vice* admission to be sought

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

CHRISTIAN SCHRECKER, individually and on behalf of all others similarly situated,

        *Plaintiff,*

    *v.*

RADLINK, INC, a California corporation,

        *Defendant.*

Case No.:

**DOCUMENT FILED PROVISIONALLY UNDER SEAL**

**EXPERT DECLARATION OF SANTIAGO AYALA**

1

Pursuant to 28 U.S.C. § 1746, I hereby declare and state as follows:

1. My name is Santiago Ayala. I am an adult over the age of 18 and a resident of Bradenton in the state of Florida. I have personal knowledge of each of the matters stated herein, and if called upon to testify I could and would testify competently about them.

2. I serve as partner in ATX Forensics LLC. I have extensive experience in conducting forensic computer investigations in support of law enforcement and to investigate white-collar schemes and economic fraud. I have assisted in the investigation of over a thousand cases including high profile civil and criminal cases since 2004. I serve as a board member for the Forensic Expert Witness Association (Florida Chapter). A copy of my CV is attached as exhibit A. My opinions in this declaration are based upon my education, knowledge, experience, expertise, training and my review of the Complaint ("Complaint") and the computer systems, described below.

3. I have been asked to opine on the nature of certain vulnerabilities regarding Radlink's web portals that were identified by Plaintiff's Complaint. I was not asked to nor did I exploit any of the vulnerabilities identified in the Complaint.

## I. Factual Observations of the Vulnerabilities in Radlink's Web Portals.

4. The Complaint identifies a number of publicly accessible websites for Radlink's web portals. On these web portals, Radlink operates internet-facing JavaBeans Open Source Software Application Server 4.2.2 ("JBoss") servers that host and run systems that allow for the remote accessibility of patient radiological information. JBoss a web application server framework that is widely used across the internet. The reasons

2

1 for its popularity is that it is low cost and is "open source," meaning anyone in the

2 software community can edit, review, and maintain the source code. Through JBoss,

3 application providers are able to dynamically create interactive web sites for users using

4 JavaServer Pages ("JSP"). This interactivity is facilitated through what are called

5 "consoles" and "invokers."

6      5.     Consoles and invokers require direct access to server resources to function

7 properly and, as such, must be secured. Security is accomplished through proper

8 configuration of settings or through removal if they are redundant or unused. Proper

9 configuration (and continued configuration through updates) are required to prevent

10 unauthorized access to the server and its resources.

11      6.     Relevant here, EJBInvokerServlet and JMXInvokerServlet are two invokers

12 that are known to cyber security experts as having potential cyber security vulnerabilities.

13 "Critical vulnerability exploit" ("CVE") reports serve as industry-wide warnings

14 regarding known vulnerabilities. As soon as a CVE is issued, organizations should

15 determine whether their systems are the subject of the CVE and, if so, take appropriate

16 measures to address the identified vulnerability.

17      7.     CVE 2013-4810 was issued in 2013 and relates to the EJB and JMX

18 invokers. The vulnerability identified in the CVE relates to the default configuration in

19 many versions of JBoss. In particular, CVE 2013-4810 warns that certain older JBoss

20 versions are set to not authenticate by default.[1] As such, absent alterations to the JBoss

21 configuration, the EJB and JMX invokers will allow any user (authenticated or not;

22

---

23   [1]     https://access.redhat.com/articles/545183 (last visited Oct. 11, 2016).

3

1  authorized or not) to access server resources by, for instance, issuing commands to the

2  server.

3     8.    Any such server running the listed JBoss versions is susceptible to a

4  security breach unless it is fixed. By exploiting CVE-2013-4810, an unauthorized actor

5  can submit malicious commands to the affected server. Documented attacks have

6  revealed that an unauthorized actor can upload malicious files to a server.

7     9.    Over the last months, security researchers and incident responders have

8  observed several campaigns specifically targeting vulnerable and out of date instances of

9  JBoss servers across the world. CISCO has published various articles specifically to a

10  Ransomware family called SamSam[2] affecting installation of JBoss systems across the

11  web. In addition to CISCO, the FBI and Microsoft[3] have also issue statements regarding

12  other ransomware families exploiting JBOSS servers.

13     10.   Red Hat has also published an article titled "Is my JBoss / EAP Server

14  Vulnerable to [SamSam] Ransomware?" that explains with details the systems at risk and

15  provides steps to verified and resolved unpatched vulnerable versions of JBoss servers.

16  The article can be found at https://access.redhat.com/solutions/2205341.

17     11.   Servers running susceptible versions of JBoss are easy to find and are prime

18  targets for unauthorized actors. Entities that continue to operate susceptible JBoss

19  instances are also likely to have poor cyber security protocols in place. That is because

20  CVE-2013-4810 is relatively easy to remedy and if an entity has not addressed that CVE,

21  it is unlikely that they have addressed other similar vulnerabilities or implemented

22  [2] http://blog.talosintel.com/2016/04/jboss-backdoor.html (last visited Oct. 11, 2016).
   [3] http://news.softpedia.com/news/fbi-and-microsoft-warn-of-samas-ransomware-501914.shtml
23  (last visited Oct. 11, 2016).

4

1  protocols to monitor the security of their systems. In addition, there are several programs

2  available on the internet designed to make exploitation of CVE-2013-48 a trivial matter.

3      12.    As the Complaint describes, Radlink's web portals are running version

4  4.2.2 of JBoss. According to documentation found online, JBoss version 4.2.2 was

5  released on 10/22/2007 and it is an "End of Life" with no support product available.[4]

6  Improper configuration of the webserver security has exposed configurations files that

7  could allow malicious actors to gather important and potentially sensitive information.

8  This information can be accessed prior to authentication.

9      13.    The Complaint also shows screenshots of one of Radlink's web portals that

10  indicate that Radlink's servers may already have been compromised. Several of the listed

11  "Applications" are common file names related to available exploit tools used to penetrate

12  the security of JBoss servers. For instance, the Complaint identifies Radlink's portal

13  located at 74.127.206.77:8080 which contains file names related to the JexBoss Exploit

14  Toolkit. JexBoss is an exploit tool created and distributed online that allows malicious

15  actors to easily and inexpensively attack servers with insecure implementations of JBoss.

16  The Complaint also identifies applications present on Radlink's web portal servers that

17  are likely capable of performing unauthorized remote command execution (Shell).

18  **II.    <u>Opinions</u>**

19      14.    It is my opinion that Radlink has been negligent and has not follow industry

20  standard security practices in its implementation and upkeep of JBoss platforms. As a

21

22

---

23  [4]    http://jbossas.jboss.org/downloads (last visited Oct. 11, 2016).

1    result, the third parties have apparently gained partial, if not complete, control over

2    Radlink's web portals.

3         15.    It is my opinion, based on the allegations in the Complaint that the servers

4    contain or allow access to confidential patient information, Radlink may have exposed

5    the private and sensitive information on or accessible through its web portals by failing to

6    properly configure its JBoss systems and address CVE-2013-4810. Although there is no

7    indication in the Complaint that patient data has been breached, it is my opinion that it is

8    possibility (even a likelihood) because it appears that a third party has begun exploiting

9    CVE-2013-4810.

10        16.    It is also my opinion, Radlink can address and resolve CVE-2013-4810

11   relatively quickly and inexpensively without incurring unreasonable costs.

12        17.    It is my opinion, Radlink can remove JexBoss and other malware from its

13   web portals relatively quickly and cheaply without incurring unreasonable costs.

14        18.    I declare, under penalty of perjury, that the factual statements above are

15   true and correct to the best of my knowledge, and the expressions of opinion stated above

16   are based on my best professional judgment.

17   Executed on this 11th day of October, 2016, at Bradenton, Florida.

18

19                                              _____  10/11/2016

20                                              Santiago Ayala

21

22

23

                                    6

# EXHIBIT A



# Santiago Alejandro Ayala Capriles

santiago@atxforensics.com | 1-888-ATX-2009

## Career Overview

Santiago Ayala has over ten years of experience in the digital data forensic, eDiscovery, information systems technology, and cyber security fields. Santiago has assisted in the investigation of over a thousand cases including high profile civil and criminal cases since 2004. Santiago has close working relationships with several computer forensics and eDiscovery software vendors providing technical improvement suggestions and guidance. As a cyber security analyst, Santiago has conducted malware analysis, network intrusion and information systems breach analysis providing input to the US Government for national security and cyber security events.

Santiago received the 2014 Digital Forensic Examiner of the Year Award presented by Forensic:4Cast at SANS DFIR Summit is Austin, Texas and he is a current holder of two SANS Lethal Forensicator Coins. Santiago is a Private License Investigator in the State of Florida.

Santiago Ayala currently serves as a Board Director member for the Forensic Expert Witness Association (Florida Chapter)

## Professional Experience

- Digital Forensic Consultant / Founding Partner – ATX Forensics, LLC – January, 2015 to Present
- Senior Forensic Engineer / Director of Forensics Service, PFI Core Forensic - The Sylint Group, Sarasota FL. - October 2004 to January, 2015.
- Co-Owner - Inversiones Design PC 2020 C.A. – Caracas, Venezuela. 1998 – 2003 (Computer Data Recovery, System design and support)
- Graphic Designer - VS Diseños Gráficos C.A. – Caracas, Venezuela – 1997 -2004. Graphic design material and custom design of stands for Medical industry.

## Certifications

- Guidance Software certification, EnCase Certified Examiner (EnCE)
- International Society of Forensic Computer Examiners, Certified Computer Examiner (CCE)
- PCI Professional (PCIP)
- X-Ways certified user – (X-PERT)
- Cellebrite Certified Logical Operator (CCLO)
- Cellebrite Certified Physical Analyst (CCPA)



## Education
- 1997-2000 Instituto Tecnológico Venezuela. Marketing and Advertising.
- 1992-1995 Universidad Central de Venezuela. Chemical Engineering.

## Digital Forensic Courses / Training
- X-Ways Software Technology AG, Memory Forensics
- Guidance Software, EnCase Advance Computer Forensics
- Guidance Software, Computer Forensics I
- Guidance Software, Computer Forensics II
- Guidance Software, Advance Internet Examinations
- X-Ways Software Technology AG, X-Ways Forensics
- X-Ways Software Technology AG, File Systems Revealed
- PCI QSA Training
- Cellebrite Certified Logical Operator
- Cellebrite Certified Physical Analyst

## Presentations
- Cyber - Developments in LatAm - 2016 Miami | Latin American Claims (re) Insurance Forum – May 19th, 2016
- Station to Innovation - Return on Awareness, Preparing for Cybersecurity Incidents – March 2016.
- Dimensional Fund Advisors – Return on Awareness 2.0 (Mental Model) – January 2016
- DKE Annual Advisor Conference – Return on Awareness -  June 2015
- The Challenges of Collecting Data following an Incident: Forensic Best Practices for when Best Practices Don't Work. Techno Security & Forensics Investigations Conference / Mobile Forensics World, Myrtle Beach, South Carolina, June 2014.
- Digital Evidence & Preservation of Evidence. ACFE Association of Certified Fraud Examiners - Tampa chapter April, 2014.
- Florida Private Investigator Associations and Local Law Enforcement.  Sarasota FL, May 2011. Computer Forensic presentation covering the following areas:
    - Chain of Custody Documents and importance;
    - Evidence handling;
    - Forensic Imaging;
    - What forensic software to choose and acceptance in Judicial and Federal courts.
- American Bar Association EDDE / ISC meeting on Digital Evidence, Presenter - Sarasota, FL, January 2009.

## Publication, Awards, Affiliations
- SANS DFIR NetWars 1st Place – EnFuse 2016, Las Vegas – May 25, 2016



2014 Forensic 4:Cast Digital Forensic Investigator of the Year. Presented by 4:Cast (Forensics4cast.com) SANS DFIR Summit on Monday June 9, 2014 in Austin, Texas.

- SANS Lethal Forensicator Coin Holder
  *http://digital-forensics.sans.org/community/lethal-forensicator*
- SANS DFIR NetWars 1st Place tie - CEIC 2013, Orlando May 21, 2013
- Case 99 - Forensic Case Study - Determining If Files Are Copied to USB Devices Based on Last Accessed Dates. ISSA Journal, June 2011
- Board of Director (Florida Chapter) - Forensics Expert Witness Association (FEWA).

Florida PI License C 1400028
Texas PI License 322298d

 https://www.linkedin.com/in/santiagoayala

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| CHRISTIAN SCHRECKER, individually and on behalf of all others similarly situated,<br><br>        *Plaintiff*,<br><br>    *v.*<br><br>RADLINK, INC, a California corporation,<br><br>        *Defendant*. | Case No.:<br><br>**DOCUMENT FILED PROVISIONALLY UNDER SEAL**<br><br>**DECLARATION OF EVE-LYNN RAPP PURSUANT TO FED. R. Civ. P. 65(b)(1)(B)** |

1

Pursuant to 28 U.S.C. § 1746, I hereby declare and state as follows:

1. I am an attorney admitted to practice in Illinois. I am entering this declaration in support of Plaintiff's Motion for a Temporary Restraining Order. This declaration is based upon my personal knowledge unless otherwise indicated. If called upon to testify as to the matters stated herein, I could and would competently do so.

2. I am a partner of the law firm Edelson PC, which has been retained to represent the named Plaintiff in this matter, Christian Schrecker.

3. This declaration recites my efforts to provide Defendant Radlink, Inc., with notice, pursuant to Fed. R. Civ. P. 65(b)(1)(B), of Plaintiff's intent to seek a temporary restraining order.

4. By October 13, 2016, before 5:00 pm PT, I will cause service processors to serve contemporaneous with the filing and on a rush basis Defendant Radlink, Inc., with a copy of the Complaint, the Motion for a Temporary Restraining Order, and Motion to Seal, at its headquarters located at 815 N. Nash St., El Segundo, California 90245.

5. By October 13, 2016, before 5:00 pm PT, I will also cause an attorney from my firm to contact Radlink, Inc.'s Chief Executive Officer and President, Thomas T. Hacking, and Chief Technology Officer, Wenchao Tao, via email and telephone, identifying this lawsuit and Plaintiff's intent to seek a temporary restraining order. My firm will provide Messrs. Hacking and Tao, and any other Radlink, Inc., representative identified by them, with email copies of all documents filed today with the Clerk of the Court.

6. Plaintiff will perfect service once the Complaint, the Motion for a Temporary Restraining Order, and Motion to Seal have been filed with the Clerk of Court as well, pursuant to Fed. R. Civ. P. 4(h), on Defendant's headquarters at 815 N. Nash St., El Segundo, California 90245 and to its registered agent, Thomas Hacking at 646 Elkins Road, Los Angeles, California

2

90049.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 13th day of October, 2016, at San Francisco, California.

Evelyn J Rapp

3