Rafey S. Balabanian (*pro hac vice*)
rbalabanian@edelson.com
Eve-Lynn J. Rapp (*pro hac vice*)
erapp@edelson.com
EDELSON PC
123 Townsend Street
Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Benjamin S. Thomassen (*pro hac vice*)
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

[Additional counsel appear on signature page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| DEBRA BLUM and JORDAN GARST individually and on behalf of all others similarly situated,<br><br>            *Plaintiffs*,<br><br>      *v.*<br><br>RADLINK, INC, a California corporation,<br><br>            *Defendant*. | Case No.: 16-cv-3511-PHX-DJH<br><br> Hon. Diane J. Humetewa<br><br><br><br><br>**JURY DEMAND** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Debra Blum and Jordan Garst bring this First Amended Class Action Complaint against Defendant Radlink, Inc. ("Radlink" or "Defendant") to obtain relief from Defendant's failure to protect patients' private medical information with promised data security. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief, including investigation conducted by their attorneys, as to all other matters.

### NATURE OF ACTION

1.      Defendant Radlink is a medical device manufacturer and software developer in the field of radiology. Until very recently,[1] radiologists could remotely view and access patients' medical information using Radlink's products, including x-ray and CAT scan images, and conduct analysis to reach a diagnosis.

2.      To facilitate remote diagnosis, Radlink provided internet linked "portals" into physicians' and clinics' patient databases. Radlink's portals were public websites that (when configured correctly) required users to enter usernames and passwords before they were granted access to private patient information. Unfortunately, Defendant failed to keep patients' confidential medical information secure. On October 13, 2016, former Plaintiff Christian Schrecker filed a class action complaint alleging that Defendant's computer systems suffered from a critical vulnerability in three of its internet and publicly accessible websites. The result of the vulnerability was that private medical information entrusted to Radlink by patients had been exposed, was very likely accessed

---

[1] *See* dkt. 32-1, Declaration of Thomas Hacking, ¶ 7.

1   and/or viewed by unauthorized third parties, and was at great risk of further unauthorized

2   disclosure and breach. Worse, Plaintiff Schrecker alleged that hackers had already began

3   exploitation of Radlink's systems—a fact strongly supporting that unauthorized third

4   parties had at least viewed the confidential medical information in Radlink's control.

5        3.      This "critical vulnerability exploit" was known to those in the cyber

6   security industry since at least 2013 and could have been "address[ed] and resolve[d] …

7   relatively quickly and inexpensively without incurring unreasonable costs."[2] Despite this

8   cheap fix, Plaintiff Schrecker alleged that Radlink eschewed security and exposed patient

9   data. In fact, as a result of Defendant's failure to address the alleged vulnerabilities,

10  "third parties [had] apparently gained partial, if not complete, control over Radlink's web

11  portals."[3]

12       4.      Former Plaintiff Schrecker alerted Radlink about the vulnerability and

13  hacks by filing his Complaint, which Radlink repaired and addressed shortly thereafter

14  (i.e., on November 4, 2016). While this fix stood to better protect Plaintiffs' and other

15  Class Members' patient data moving forward, it cannot turn back the clock and correct

16  months—if not years—of Radlink's continual and demonstrated failure to protect the

17  patient data entrusted to it. In fact, because of this extended, easily exploitable, and

18  unmitigated exposure of patient data, patients whose data was retained by Radlink remain

19  at risk of suffering further harm from this long-term exposure of their confidential and

20  sensitive information.

21
_____

22  [2]      Expert Declaration of Santiago Ayala ("Ayala Decl.") at ¶¶ 9, 16. A true and accurate
    copy of the Ayala Declaration is attached hereto as Exhibit A.
    [3]      *Id.*

23

1    5.    Beyond the palpable risk created by its actions, by exposing Plaintiffs' and

2    the putative Class's private medical information for months or even years, Radlink

3    injured patients by charging and collecting market-rate radiological fees without

4    providing industry standard protections for patient data confidentiality. Worse, by

5    choosing to operate its public websites with critical—and well-known—vulnerabilities,

6    like the one identified by former Plaintiff Schrecker, Defendant failed to adequately

7    allocate resources necessary to maintain patient data security.

8    6.    Accordingly, this putative class action lawsuit seeks, among other things,

9    (i) damages and restitution, (ii) to compel Radlink to allow an independent, third-party

10   firm to conduct a security audit, (iii) to inform patients whose information was stored by

11   Radlink—while its systems were vulnerable and being hacked—that their information

12   was exposed, and (iv) attorneys' fees and costs.

13   **PARTIES**

14   7.    Plaintiff Debra Blum is a natural person and citizen of the State of Arizona.

15   8.    Plaintiff Jordan Garst is a natural person and citizen of the State of

16   California.

17   9.    Defendant Radlink, Inc. is a corporation incorporated under the laws of the

18   state of California with a principal place of business at 815 North Nash Street, El

19   Segundo, California 90245. Defendant conducts business throughout this District, the

20   State of Arizona, and the United States.

21   **JURISDICTION AND VENUE**

22   10.   Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2)

23   because (a) at least one member of the class is a citizen of a state different from

4

1   Defendant, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and

2   costs, and (c) none of the exceptions under that subsection apply to this action.

3       11.     The Court has personal jurisdiction over Defendant because Defendant

4   conducts significant business transactions in this District, and because the wrongful

5   conduct occurred in and/or was directed to this District.

6       12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a

7   substantial part of the events giving rise to Plaintiff Blum's claims occurred in this

8   District, Plaintiff Blum resides in this District, and because Defendant resides in this

9   District.

10                          **FACTUAL ALLEGATIONS**

11  **I.      Radlink Had a Duty to Secure Patients' Data in its Portals.**

12      13.     Radlink is a software developer and medical device manufacturer in the

13  field of radiology. Radlink partners with physicians and clinics to transition analog (i.e.,

14  film) radiological equipment to digital. Radlink's clients include, for instance, Strategic

15  Imaging MD ("Strategic Imaging"), a radiological group that specializes in teleradiology,

16  which is the ability to remotely view and diagnose patients' x-rays and CT scans.

17  Strategic Imaging explains teleradiology in the following way:

18          Many of us trained before digital imaging was an option. All analog film
            was read in-house, and many hours were spent processing films. Some new
19          radiology graduates have never read a nondigital film, and they've never
            had to drive back to the hospital to read a CT performed after hours. These
20          exams can now be quickly processed and transferred to any location where

21

22

23

5

1    an expert can review the study.[4]

2       14.    Radiologists purchase Radlink devices and software to service their own

3    practices. Then those customers, like Strategic Imaging, partner with physicians groups,

4    clinics, and hospitals to provide outsourced and offsite radiological services. For instance,

5    FastMed Urgent Care Centers, with dozens of locations across North Carolina, Texas,

6    and Arizona, partnered with Strategic Imaging for its patients' radiological analysis. A

7    patient with a suspected broken foot would visit a FastMed location, have an x-ray taken,

8    and a Strategic Imaging radiologist would analyze the image remotely using Radlink's

9    software.

10       15.    To facilitate remote diagnosis, Radlink created and maintained systems

11    where radiologists could access detailed records of patients' radiological charts and other

12    medical information. Some of these systems were further connected to the internet and

13    acted as portals into Radlink's patient data repositories.

14       16.    The systems Radlink implemented included WebPro and BackupMgr (i.e.,

15    back up manager). Some of Radlink's web portals are or were publicly available at the

16    addresses: 66.117.1.108:8080/radlink, 74.124.206.77/radlink,

17    https://radlink.strategicimagingmd.com:8443/radlink/, and

18    https://radlink.strategicimagingmd.com:8443/backupmgr/. On these portals, Radlink

19    maintained patients' confidential medical information in electronic storage.

20       17.    Moreover, Radlink's customers, such as Chow Hip and Knee, Strategic

21    _____
    [4]    *Teleradiology supports local radiologists, hospitals, patients*,
22    https://www.auntminnie.com/index.aspx?sec=log&URL=http%3a%2f%2fwww.auntmin
    nie.com%2findex.aspx%3fsec%3dsup%26sub%3dpac%26pag%3ddis%26ItemID%3d106520%2
23    6wf%3d1 (last visited Feb. 10, 2017).

1   Imaging and FastMed, are covered entities under the Healthcare Insurance Portability and

2   Accountability Act ("HIPAA"), which regulates the privacy of patient information.[5] As

3   such, Radlink is a "Business Associate" because it is "a [corporation] who: (i) On behalf

4   of [a] covered entity or of an organized health care arrangement … creates, receives,

5   maintains, or transmits protected health information for a function or activity regulated

6   by this subchapter, including … data analysis [and] processing"[6] and must comply with

7   HIPAA regulations.

8          18.    Moreover, Radlink regularly received, maintained, and transmitted

9   "Protected Health Information", which HIPAA defines as information that is transmitted

10  or maintained in any form or medium, including:

11          a subset of health information, including demographic information
            collected from an individual, and: (1) Is created or received by a health care
12          provider, health plan, employer, or health care clearinghouse; and (2)
            Relates to the past, present, or future physical or mental health or condition
13          of an individual; the provision of health care to an individual; or the past,
            present, or future payment for the provision of health care to an individual;
            and (i) That identifies the individual; or (ii) With respect to which there is a
14          reasonable basis to believe the information can be used to identify the
            individual.[7]

15          19.    Title II of HIPAA contains what are known as the Administrative

16  Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among

17  other things, that the United States Department of Health and Human Services create

18  rules to streamline the standards for handling Protected Health Information, like the data

19  maintained on Radlink's websites.

20          20.    These regulations state that "[a] covered entity or business associate must

21

22  ─────────────────
    [5]   45 C.F.R. § 160.103.
    [6]   45 C.F.R. § 160.103.
    [7]   *Id*.

23

7

comply with the applicable standards, implementation specifications, and requirements of this subpart with respect to electronic protected health information of a covered entity."[8]

21.     Radlink recognizes that the patient information it maintained was HIPAA Protected Health information and, as such, that was required to comply with HIPAA. In its advertising and marketing, Radlink highlighted that its technology was advanced but still HIPAA compliant, stating that "all digital images [are] stored in a secure, HIPAA compliant database for future access."[9] And, that "[Radlink's] system is highly fault tolerant with a redundant hardware and software configuration, along with automatic backup and disaster recovery for HIPAA compliance. It comes with 2 terabytes of storage (5 years of images for a typical practice) and is scalable to 20 terabytes. Because our system is tied to the web, images can be accessed remotely by any radiologist of your choosing."[10]

22.     Despite making the above compliance promises (and being obligated under law), Radlink did not keep patients' confidential medical information secure and confidential.

## II.     Plaintiff's Complaint Revealed That Radlink Failed To Properly Protect Patients' Confidential Medical Information.

23.     Although Radlink has continuously represented that it is committed to maintaining patient privacy, former Plaintiff Schrecker's original complaint revealed that

---

[8]     45 C.F.R. § 164.302.
[9]     *Radlink Introduces New Family of Digital Imaging Products*, http://www.prnewswire.com/news-releases/radlink-introduces-new-family-of-digital-imaging-products-59870172.html (last visited Feb. 10, 2017).
[10]     *PACS Solutions – Radlink Inc.*, http://www.radlink.com/index.php/products/software/pacs-solutions/ (last visited Feb. 10, 2017).

1   Radlink exposed the confidential medical information of thousands of patients on its web

2   portals. Specifically, Radlink's network-connected patient radiological portals, which

3   contained patient medical, and radiological information ("Portals"), lacked basic and

4   fundamental security safeguards and were vulnerable to cyber security attacks and the

5   further release of confidential medical information. And, a review of Defendant's public

6   websites revealed that hackers were (at the time Plaintiff Schrecker filed his complaint)

7   controlling Defendant's servers.

8        *A.   Radlink's Portals Stored Patients' Confidential Medical Information.*

9        24.   Through its portals, Radlink allowed physicians and clinical staff to access

10  patients' medical and radiological information. Defendant Radlink owned and operated

11  the websites 66.117.1.108:8080/radlink, 74.124.206.77:8080/radlink,

12  https://radlink.strategicimagingmd.com:8443/radlink,

13  https://hipandpelvis.radlink.com:8443/radlink, https://74.124.206.53/radlink,

14  http://oar.radlink.com:8080/radlink/, https://chowhipandknee.radlink.com:8443/radlink,

15  https://74.124.206.75:8443/radlink, and https://svr.radlink.com:8443/radlink where it

16  provided access to its Portals. Physicians and clinical staff seeking access to patient

17  medical and radiological records could use an internet browser (i.e., Google Chrome or

18  Mozilla Firefox) to navigate to a Portal address (e.g., 66.117.1.108:8080/radlink). Once at

19  that website, Defendant's servers loaded a login prompt where authorized users (e.g.,

20  physicians) were required to enter their usernames and passwords to proceed. *See* Figure

21  1.

22

23

1

2

3

4

5

6

7

8

9



10          (**Figure 1.**)

11          25.      Upon entering a valid username and password, Defendant's systems would

12  present them with ability to view medical information for all listed patients:

13



14

15

16

17

18

19

20

21          (**Figure 2**, showing a screenshot from Defendant's manual for its portals

22          which is populated with sample patient information)

23          26.      When a physician selected a specific patient, Defendant's systems showed

more detailed information:



(**Figure 3**, same with sample radiological data.)

27.    The Portal also stored detailed medical records, such as the patients'

demographic information, "reason for study," "history," and more:



(**Figure 4**, same for data types stored in portals)

11

28.     Defendant maintained such copious and detailed patient medical information because, as Defendant describes in one its product guides, the Portals are integrated into physicians' and clinics' medical systems (i.e., the "Local Area Network"). Through this integration, Defendant's Portals facilitated internet access to the same medical records available in the physicians' or clinics' office:



(**Figure 5**, showing the Portals circled in red.)

29.     Until a short time after the filing of former Plaintiff Schrecker's original Complaint, Defendant's Portals did not limit access to only individuals with valid usernames and passwords. Instead, Defendant had improperly configured its servers and left them running out-of-date software. A review of the publically available specifications of Defendant's Portals showed that they ran on decade-old software and had not been

1   updated with critical security patches and, incredibly, were then being hacked.

2       B.   *Radlink's Portals left patients' confidential medical information exposed.*

3       30.   Defendant's Portals suffered from two glaring vulnerabilities. First, the

4   Portals ran on an outdated version of a software, called JBoss, that allowed hackers to

5   bypass authentication. Second, Defendant had improperly configured its web systems

6   and, as a result, its systems leaked sensitive and confidential information *before* any

7   authentication was attempted. Worse, public information indicates that Defendant's

8   servers themselves were compromised by hackers.

9           1.   The JBoss Vulnerability

10      31.   Defendant's Portals are built on "JBoss Application Servers" which

11  implement Java (a virtual computing language) for applications. By using Java, service

12  providers are able to let users run applications on myriad devices without having to

13  rewrite the application for each type of device (*e.g.*, a single Java application can run on a

14  Mac and a PC without modification).

15      32.   Radlink's implementations of JBoss were woefully out-of-date and suffered

16  from a critical vulnerability (the "JBoss Vulnerability"). Defendant's JBoss systems were

17  listed as running version 4.2.2. A review of industry literature reveals that that version of

18  JBoss was introduced in 2005 and is listed as "End of Life," or, no longer supported or

19  recommended for use. For comparison, the latest version of JBoss (now called WildFly)

20  is version 10.

21      33.   In September 2013, the National Institute of Standards and Technology,

22  sponsored by the Department of Homeland Security, updated its National Vulnerability

23  Database to include a vulnerability specific to this version of JBoss. NIST reported that

13

1   the vulnerability was "network exploitable," had a "low" level of access complexity, and

2   that it "[a]llows unauthorized disclosure of information; [a]llows unauthorized

3   modification; [and a]llows disruption of service."[11] That is, JBoss version 4.2.2 allows

4   hackers to access previously protected information with little to no effort.[12]

5        34.   The risk of this vulnerability is not just theoretical. Computer security

6   experts have recently observed an ongoing and "widespread campaign" attacking JBoss

7   computer systems of the exact type used by Defendant.[13] In these attacks, "[a]dversaries

8   are exploiting known vulnerabilities in unpatched JBoss servers [just like Defendant's

9   out-of-date servers] before installing [malicious software], identifying further network

10  connected systems, and installing SamSam ransomware to encrypt files on these

11  devices." That is, hackers are targeting entities that have not updated their JBoss servers

12  and then holding sensitive data hostage until a ransom is paid.

13       35.   On April 4, 2016, a user commented about this attack with the following:

14       We were hit by this ransomware and I wasn't sure if it was jboss related or
         a compromised user account. Good to at least know it was jboss related.
15       We had port 443 open to the world on an aging server[14]

16  That user, just like Radlink, ran an outdated server that was exposed to the internet ("port

17  443 open to the world") and was attacked.

18  _____
    [11]    *NVD – Detail*, https://web.nvd.nist.gov/view/vuln/detail?vulnId=CVE-2013-4810 (last
19  visited Feb. 10, 2017); *see also Does CVE-2013-4810 affect Red Hat JBoss products? - Red Hat
    Customer Portal*, https://access.redhat.com/articles/545183 (last visited Feb. 10, 2017);
20  https://access.redhat.com/solutions/30744 (last visited Feb. 10, 2017).
    [12]    Specifically, Radlink's JBoss implementation was misconfigured in a way that users
21  could access the "JMXInvokerServlet" and "EJBInvokerServlet" JBoss "servlets" (i.e., server
    interfaces) without authorization.
22  [13]    *Cisco Talos Blog: SamSam: The Doctor Will See You, After He Pays The Ransom*,
    http://blog.talosintel.com/2016/03/samsam-ransomware.html?m=1 (last visited Feb. 10, 2017).
23  [14]    *Id.*

36.     Last year, the technical publication Ars Technica also reported on the exploitation of the JBoss vulnerability:

… a number of health providers have been infected recently through Web servers running JBoss.

…

The malware, called "Samsam" by Talos, uses old, very public exploits right out of JexBoss—an open source vulnerability testing tool for JBoss. Once the malware has a foothold on the server, it spreads to Windows machines on the same network.

….

Of the "couple of dozen targets" … a significant number of them are healthcare organizations. This is likely not because the attackers set out to target healthcare specifically, but because of the types of applications used by hospitals and healthcare networks. Wilson believes that the ransomware developer simply scanned for vulnerable servers on the Internet, and most of the ones that were discovered were at healthcare organizations.

"A lot of people in the healthcare industry—they set up websites in a kind of fire and forget fashion," Wilson explained. "They hire an IT guy, they get the billing system set up, hook it up to the website and then they never touch it again. That's the perfect environment for this type of malware to thrive in because it's not maintained. They have no full-time security staff and few if any fulltime administrators. As a result, the software just goes unpatched."[15]

37.

2.     Defendant Leaked Credentials Prior to Authentication

38.     As introduced above, Defendant also improperly configured its systems and, as a result, leaked sensitive cyber security information to anyone listening. When users initially visited Defendant's portals, their internet browser (e.g., Safari or Chrome)

---

[15]     *Two more healthcare networks caught up in outbreak of hospital ransomware | Ars Technica*, http://arstechnica.com/security/2016/03/two-more-healthcare-networks-caught-up-in-outbreak-of-hospital-ransomware/ (last visited Feb. 10, 2017).

1  would display the login screen shown in <u>Figure 1</u>. However, behind the scenes,

2  Defendant's servers sent additional information to the user's browser even though most

3  users were ignorant of its existence. To hackers and malicious users, though, this

4  information is a treasure trove because it reveals details about Defendant's cyber security

5  measures (or lack thereof).

6       39.    For instance, on an initial visit, Defendant leaked the following

7  information, described in its user guides as relating to the "PACS Server Setting"[16]:

```
HTTP/1.1 200 OK
Server: Apache-Coyote/1.1
X-Powered-By: Servlet 2.4; JBoss-4.2.2.GA (build: SVNTag=JBoss_4_2_2_GA date=200710221139)/Tomcat-5.5
Content-Disposition: attachment
Content-Type: application/json;charset=utf-8
Content-Length: 1542
Date: Tue, 14 Jun 2016 18:17:26 GMT
Connection: close

//OK[4,11112,'h',0,51,4,50,2,4,104,'g',49,5,4,48,2,4,11566,'f',0,15,4,47,2,4,11565,'e',0,15,4,46,2,4,11559,'d',0,15,45,44,2,4,11555,'c',0,15,4,43,2,
4,11553,'b',0,15,4,42,2,4,13494,'a',41,15,4,40,2,4,13494,'Z',38,15,4,39,2,4,13494,'Y',38,15,4,37,2,4,13494,'X',36,15,4,35,2,4,11112,'W',0,34,4,33,
2,4,11541,'V',0,15,4,32,2,4,11535,'U',0,15,4,31,2,4,13496,'T',0,5,30,29,2,4,104,'S',0,28,4,27,2,4,11112,'R',0,26,4,25,2,4,13494,'Q',0,5,4,24,2,4,11
114,'P',0,11,4,23,2,4,11114,'O',0,22,4,21,2,4,11504,'N',0,15,4,20,2,4,11114,'M',0,19,4,18,2,4,11114,'L',0,9,4,17,2,4,11563,'K',0,15,4,16,2,4,11562
,'J',0,15,14,13,2,4,11115,'I',0,5,4,12,2,4,105,'H',0,11,4,10,2,4,105,'G',0,9,4,8,2,4,104,'F',0,7,4,6,2,4,11112,'D',0,5,4,3,2,30,1,['java.util.Vector/312
5574444',"com.radlink.viewer.client.AE/3781500419","sicloudpacs","","localhost","homews","192.168.101.109","wspc","192.168.101.102","fa
rookiws","10.200.233.156","test","mammopc_dcmsrv","Office
Workstation","74.124.206.52","farooki_dcmsrv","wspc_dcmsrv","aghera_dcmsrv","10.200.234.150","wspc_dcmsrv.tmp","lomis_dcmsrv","192.1
68.1.124","farooki_dcmsrv.norm","huchun_dcmsrv","fastmedpacs","10.10.1.11","CS2-2535","192.168.1.51","pacs103","PACS 103 Test Node at
168.93","dougherty_dcmsrv","fox_dcmsrv","proimagepacs","72.27.224.194","ULTRA_ARCHIVE","Alliance Urgent Care","PUC_Corinth","PUC
Corinth","Mindray M5","PUC-Booneville","PUC Booneville","dcmsrv_keshad","sarangi_dcmsrv","dsrvdcm","Dougherty PC
02","greg_dcmsrv","feolebk_dcmsrv","FPMTNCOLCR01","fpCollinwood","sicpacstemp","108.61.149.162"],0,6]
```

16  (**Figure 6.**)

17      40.    Beyond the PACS Server Settings, Defendant released sensitive cyber

18  security information that Defendant describes as its customers' access groups and the

19  functions they can execute, such as opening a "Preliminary report entered by clinician":

20

21

22

---

[16]    ThinPACS at 14.

23

HTTP/1.1 200 OK

Server: Apache-Coyote/1.1

X-Powered-By: Servlet 2.4; JBoss-4.2.2.GA (build: SVNTag=JBoss_4_2_2_GA date=200710221139)/Tomcat-5.5

Content-Disposition: attachment

Content-Type: application/json;charset=utf-8

Content-Length: 8251

Date: Tue, 14 Jun 2016 18:17:26 GMT

Connection: close

//OK[1,["<?xml version=\"1.0\" encoding=\"UTF-8\"?>\n<WorkflowPipeLine>\n  <SecurityCode name=\"SCLOCALDOC\" desc=\"Workflow: Clinician\" id=\"10\"?>\n  <SecurityCode name=\"SCCENTRALDOC\" desc=\"Workflow: Strategic Imaging Radiologist\" id=\"20\"?>\n  <State name=\"ARRIVED\" desc=\"Arrived\" id=\"50\"?>\n  <State name=\"PRELIMINARY\" desc=\"Preliminary report entered by clinician\" id=\"100\"?>\n  <State name=\"REVIEWED\" desc=\"Radiologist has reviewed the study, but no report is issued\" id=\"150\"?>\n  <State name=\"FINALIZED\" desc=\"\" id=\"200\"?>\n  <State name=\"FINALIZED+ADDENDUM\" desc=\"\" id=\"300\"?>\n  <State name=\"FINALIZED+ADDENDUM III\" desc=\"\" id=\"400\"?>\n  <State name=\"FINALIZED\" desc=\"\" id=\"500\"?>\n\in  <State state=\"ARRIVED\"?>\n  <Action name=\"Report\" securityCode=\"SCLOCALDOC\"?>\in    <Command name=\"EDITREPORT\" showInputFieldsOnly=\"true\"?>\in<Action name=\"Submit\" securityCode=\"SCLOCALDOC\"?>\in    <Command name=\"SAVEREPORT\" macrosForUser=\"[DictateBy]\" showAll=\"True\"?>\in    <Command name=\"CHANGESTATE\" state=\"PRELIMINARY\"?>\in    <Command name=\"EXIT\"?>\in<Action name=\"Cancel\" securityCode=\"SCLOCALDOC\"?>\in<Command name=\"EXIT\"?>\in</Action>\in    </Action>  <Action name=\"Report\" securityCode=\"SCCENTRALDOC\"?>\in      <Command name=\"EDITREPORT\"?>\in<Action name=\"Submit\" securityCode=\"SCCENTRALDOC\"?>\in    <Command name=\"SAVEREPORT\" macrosForUser=\"[FinalizedBy]\" macrosForUser=\"[Amicept]\" id=\"100\"?>\n  <State name=\"Save Draft\" securityCode=\"SCLOCALDOC\"?>\in    <Command name=\"SAVEREPORT\" state=\"FINALIZED\"?>\in<Action name=\"Cancel\" securityCode=\"SCCENTRALDOC\"?>\in<Command name=\"EXIT\"?>\in</Action>\in</Step>\in  <Step state=\"PRELIMINARY\"?>\in    <Action name=\"Report\" securityCode=\"SCLOCALDOC\"?>\in      <Command name=\"EDITREPORT\" showReadOnly=\"True\"?>\in<Action name=\"Cancel\" securityCode=\"SCLOCALDOC\"?>\in<Command name=\"EXIT\"?>\in</Action>\in  <Action name=\"Report\" securityCode=\"SCCENTRALDOC\"?>\in      <Command name=\"EDITREPORT\" macrosForTimestamp=\"[DictationDateTime]\" bookmarkMacrosForUserSignature=\"sig\"?>\in<bookmarkMacrosForSignatureDate name=\"[DictationDateTime]\" bookmarkMacrosForUserSignature=\"sig\"?>\in<Command name=\"CHANGESTATE\" state=\"FINALIZED\"?>\in<Command name=\"EXIT\"?>\in</Action>\in<Action name=\"Cancel\" securityCode=\"SCCENTRALDOC\"?>\in<Command name=\"EXIT\"?>\in</Action>\in<Action name=\"Reviewed\" securityCode=\"SCCENTRALDOC\"?>\in<Command name=\"SAVEREPORT\"?>\in      <Command name=\"CHANGESTATE\"

> " id=\"10\"/>\n  <SecurityCode name=\"SCCENTRALDOC\" desc=\"Workflow:
> c=\"Preliminary report entered by clinician\" id=\"100\"/>\n  <State
> \"200\" />\n  <State name=\"FINALIZED+ADDENDUM\" desc=\"\" id=\"300\"
> <Step state=\"ARRIVED\" >\n   <Action name=\"Report\"
> Code=\"SCLOCALDOC\">\n\t  <Command name=\"SAVEREPORT\"

state=\"REVIEWED\"?>\in    <Action name=\"Report\" securityCode=\"SCCENTRALDOC\"?>\in      <Command name=\"SAVEREPORT\"?>\in      <Command name=\"EDITREPORT\"?>\in    <Action name=\"Submit\" securityCode=\"SCCENTRALDOC\"?>\in<Command name=\"SAVEREPORT\"?>\in<Command name=\"EDITREPORT\"?>\in<Action name=\"Addendum\" securityCode=\"SCCENTRALDOC\"?>\in<Command name=\"EXIT\"?>\in</Action>\in<Action name=\"Report\" securityCode=\"SCCENTRALDOC\"?>\in    <Command name=\"EDITREPORT\"?>\in<Action name=\"Cancel\" securityCode=\"SCCENTRALDOC|SCCENTRALDOC\"?>\in<Command name=\"EXIT\"?>\in</Action>\in</Step>\in<Step state=\"FINALIZED+ADDENDUM III\"?>\in<Action name=\"Report\" securityCode=\"SCLOCALDOC\"?>\in    <Command name=\"EDITREPORT\"?>\in<Action name=\"Cancel\" securityCode=\"SCLOCALDOC|SCCENTRALDOC\"?>\in<Command name=\"EXIT\"?>\in</Action>\in</Step>\in</WorkflowPipeLine>"],0,6]

**(Figure 7**, revealing the "SecurityCode" information leaked by Defendant.)

41.     In other places, Defendant disclosed sensitive email addresses and passwords:

HTTP/1.1 200 OK

Server: Apache-Coyote/1.1

X-Powered-By: Servlet 2.4; JBoss-4.2.2.GA (build: SVNTag=JBoss_4_2_2_GA date=200710221139)/Tomcat-5.5

Content-Disposition: attachment

Content-Type: application/json;charset=utf-8

Content-Length: 178

Date: Tue, 14 Jun 2016 18:17:26 GMT

Connection: close

//OK[0,0,7,0,6,0,0,0,0,0,0,0,2,5,4,3,2,0,0,1,["com.radlink.viewer.client.Setting/1963474802", "eradlink@gmail.com", "1234eradlink5678", "y", "smtp.gmail.com", "8100", "n"],0,6]

**(Figure 8.)**

42.     By using the sensitive email address and password shown in Figure 8, hackers could have accessed Defendant's confidential communications and worse. For instance, anyone with Defendant's email credentials could have navigated to

1    www.gmail.com and logged into Defendant's email. Therein, the unauthorized user

2    would have had access to Defendant's emails, contact lists, notes, and documents, and,

3    importantly, would have been able to impersonate Defendant to obtain additional

4    confidential information from clients and patients.

5               3.    Defendant's Servers Were Compromised

6         43.    Beyond the two persistent vulnerabilities, public information indicated that

7    Defendant's servers were being hacked. Importantly, while Defendant's servers were

8    already compromised, it is possible that—but impossible for anyone other than Radlink

9    to tell whether—patient data had not and has not yet been extracted from Radlink's

10   systems. Nevertheless, Defendant operated its impaired servers for months (if not years),

11   meaning that there is a significant likelihood that it already allowed unauthorized third

12   parties to view and access the confidential medical data in its control.

13        44.    On several of Defendant's public portals, such as 74.124.206.77:8080,

14   information revealed that hackers were exploiting Defendant's servers. For instance,

15   Figure 9, on the following page, documents how a nefarious user had installed on

16   Defendant's server (presumably without authorization) the "JexBoss Exploit Tool"

17   malware, amongst others.

18

19                    *                    *                    *

20

21

22                    *                    *                    *

23



(**Figure 9**.)

45.     One of the unauthorized users then installed a "shell" (i.e., a method to control a server's resources) on Defendant's servers. As Figure 10 demonstrates, a hacker (or hackers) installed myriad unauthorized applications onto Defendant's servers:

**Application list**

localhost/
localhost/jbossass
localhost/jexinv3
localhost/jexws3
localhost/is
localhost/web-console
localhost/jbossws
localhost/radlink
localhost/sha
localhost/chao
localhost/tomandjack
localhost/shellinvoker
localhost/wado
localhost/invoker
localhost/radlinkqc
localhost/vs
localhost/rid
localhost/backupmgr
localhost/dcm4chee-arr

(**Figure 10**, showing Defendant's compromised server with the "JexBoss" malware installed, amongst others.)

46.     Only Defendant has the necessary information (e.g., server logs, records, and other cyber security information) to determine whether—and how—confidential patient data was compromised. But because Defendant operated its compromised systems for months (if not years) it is likely that it already suffered a data incident (i.e., involving the unauthorized access or removal of confidential medical information), the extent of which cannot be determined before the onset of discovery.

47.     Radlink's compromised systems demonstrate why vulnerabilities like the ones Radlink had on its Portals often serve as the entry point to other sensitive and potentially vulnerable systems. As Radlink itself describes, and as shown in <u>Figure 5</u>, reproduced below, Radlink's portals and devices were meant to be interconnected to other medical and sensitive systems:



(**Figure 5**, reproduced.)

48.     And, because Radlink's devices exist in physicians' offices and clinics,

1   there undoubtedly exist a host of connected medical devices on the same network that

2   may be vulnerable to hackers, including MRI machines[17], drug infusion machines[18], and

3   robotic surgical equipment[19]. Each of those systems might suffer from their own

4   vulnerabilities (or may not be protected by any mechanism at all) and if a hacker gained

5   further access to Radlink's (or its physician and clinical clients') systems, he or she might

6   access a physician's or clinic's internal network to tamper with at-risk patients and the

7   delivery of vital medical care.

8           49.     Bloomberg Business recently conducted in-depth reporting on the threat

9   presented by weak security in medical devices, including radiological machines like

10  Radlink's, and reported the following:

11          In several cases, the hackers "spear phished" hospital staffers, luring them
            into opening e-mails that appeared to come from senders they knew, which
12          infected hospital computers when they fell for the bait. In one case, hackers
            penetrated the computer at a nurses' station, and from there the malware
13          spread throughout the network, eventually slipping into radiological
            machines, blood gas analyzers, and other devices. Many of the machines
14          ran on cheap, antiquated operating systems, such as Windows XP and even
            Windows 2000. The hospital's antivirus protections quickly scrubbed the
15          computer at the nurses' station, but the medical devices weren't so well
            guarded.
16
            Many of the hospitals that participated in the study rely on the device
17

18  _____

    [17]    *Medical devices could be lethal in hands of hackers | TheHill*,
    http://thehill.com/policy/cybersecurity/271003-medical-devices-could-be-lethal-in-hands-of-
19  hackers (last visited Feb. 10, 2017) (stating that "Hackers could disable a certain commonly used
    piece of equipment, like an MRI machine, effectively withholding needed care.")
    [18]    *Medical Devices That Are Vulnerable to Life-Threatening Hacks | WIRED*,
20  https://www.wired.com/2015/11/medical-devices-that-are-vulnerable-to-life-threatening-
    hacks/#slide-1 (last visited Feb. 10, 2017) (noting that researchers "found vulnerabilities in the
21  pump that would allow a hacker to surreptitiously and remotely change the amount of drugs
    administered to patients to deliver a deadly dosage.")
    [19]    *Telesurgery Vulnerable to Remote Hacks, Hijacks*, https://blog.kaspersky.com/hacking-
22  robotic-surgeons/8570/ (last visited Feb. 10, 2017) (stating that "A group of academic security
    researchers remotely hacked and took control of a robot designed to perform telesurgery.")

23

manufacturers [e.g., Radlink] to maintain security on the machines, says Carl Wright, general manager for TrapX. That service is often sporadic, he says, and tends to be reactive rather than preventive. "These medical devices aren't presenting any indication or warning to the provider that someone is attacking it, and they can't defend themselves at all," says Wright, who is a former information security officer for the U.S. military.

After hackers had compromised a medical device in a hospital, they lurked there, using the machine as a permanent base from which to probe the hospital network. Their goal, according to Wright, was to steal personal medical data.[20]

50.     The Vulnerabilities that existed on Radlink's systems are the low-hanging-fruit of the cyber security world: they are easy to find and simple to exploit. As such, given the fact that a hacker had already discovered Radlink's vulnerable system, it was likely that they had already gained access to the information in Radlink's control before Radlink took its systems offline in late 2016.

51.     Plaintiff filed his initial Complaint on October 13, 2016, alerting Radlink of the JBoss Vulnerability. In his Complaint and in the Expert Report of Santiago Ayala, Plaintiff laid out the severity of the JBoss Vulnerability, how Radlink was exposing patient data to theft, that a breach was imminent unless the vulnerabilities were fixed and that Radlink was then being hacked. Then, on November 5, 2016, Defendant fixed the Vulnerabilities and removed the hacker's access from its systems.

52.     Despite its fixes—which, as Plaintiff's expert explains, could have been done "quickly and inexpensively" at any time[21]—Radlink still exposed patient data for months, if not years.

---

[20]     *Hospital Gear Could Save Your Life Or Hack Your Identity - Bloomberg Business*, http://www.bloomberg.com/features/2015-hospital-hack/ (last visited Feb. 10, 2017).
[21]     Ayala Decl. at ¶ 16.

22

C. *Radlink ignored industry standards, leaving patients' confidential medical information exposed.*

53.     Consumer expectations, HIPAA, and state law requires that healthcare providers and their business associates (like Radlink) adopt industry standard administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of consumers' confidential medical information. If Radlink followed industry standards, patients' confidential medical and radiological information would not have been exposed and/or compromised. Industry standard practices (and common sense) dictate that only verified users (e.g., physicians and medical personnel) should have been granted access to patients' confidential medical and radiological information and that all others should be prohibited from accessing that information. Myriad methods exist to ensure that does not happen on even the most basic of websites and services. For websites that maintain sensitive information, such as medical records, there exist governmental organizations, industry groups, and others that recognize the heightened demand for security and, as such, outline protocols to ensure data integrity.

54.     Broadly speaking, Radlink's security failures demonstrate that it failed to implement industry standard user verification techniques and data security as required by federal and state law, among other things. More specifically, Radlink:

a.     Failed to maintain an adequate data security system to prevent data breaches;

b.     Failed to mitigate the risks of a data breach and unauthorized access to protected health information;

c.     Failed to encrypt or otherwise protect Plaintiffs' and the Class's protected health information;

23

  d. Failed to ensure the confidentiality and integrity of electronic protected health information it created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

  e. Failed to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

  f. Failed to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

  g. Failed to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. § 164.306(a)(2);

  h. Failed to protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

  i. Failed to ensure compliance with the HIPAA security standard rules by its workforce in violation of 45 C.F.R. § 164.306(a)(4);

  j. Failed to effectively train all members of its workforce on the policies and procedures with respect to protected health information as necessary and appropriate for the members of its workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R § 164.530(b); and

  k. Failed to design, implement, and enforce policies and procedures establishing administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. § 164.530(c).

  55. Radlink also failed to comply with industry standards. Over a decade ago, in March 2005, the National Institute of Standards and Technology ("NIST") published a report detailing standards for healthcare providers seeking to comply with HIPAA's Security Rule. In the report, NIST recommended specific techniques to safeguard electronically stored sensitive information. In one example, NIST specifically

24

1    recommended that companies use "authentication mechanisms [] to verify the identity of

2    those accessing systems protected from inappropriate manipulation."[22]

3        56.    In addition, the United States Department of Health and Human Services

4    ("HHS") has issued many documents to assist covered entities better secure patient data.

5    In a white paper on "Security Standards: Technical Safeguards," the HHS explains that:

> In general, authentication ensures that a person is in fact who he or she claims to be before being allowed access to [electronic protected health information ("EPHI")]. This is accomplished by providing proof of identity. There are a few basic ways to provide proof of identity for authentication. A covered entity may:
>
> o  Require something known only to that individual, such as a password or PIN.
>
> o  Require something that individuals possess, such as a smart card, a token, or a key.
>
> o  Require something unique to the individual such as a biometric. Examples of biometrics include fingerprints, voice patterns, facial patterns or iris patterns.
>
> Most covered entities use one of the first two methods of authentication. Many small provider offices rely on a password or PIN to authenticate the user. If the authentication credentials entered into an information system match those stored in that system, the user is authenticated. Once properly authenticated, the user is granted the authorized access privileges to perform functions and access EPHI.[23]

15       57.    Radlink ignored many other long-standing industry protocols, including the

16   standard practice of regular auditing and monitoring of systems that protect sensitive

17   information. In 1996, NIST issued the "Principles and Practices for Security IT Systems,"

18   and while many specific technologies have changed since that document's release, the

---

[22]    Matthew School et al., National Institute of Standards and Technology, U.S. Dep't of Commerce, *NIST Special Publication 800-66 Revision 1: An Introductory Resources Guide for Implementing the Health Insurance Portability and Accountability Act (HIPAA) Security Rule* (Oct. 2008), at 23, *available at* http://csrc.nist.gov/publications/nistpubs/800-66-Rev1/SP-800-66-Revision1.pdf.

[23]    Department of Health and Human Services, *HIPAA,* http://www.hhs.gov/ocr/privacy/hipaa/administrative/securityrule/techsafeguards.pdf (last visited Jan. 3, 2017).

25

1  underlying guidelines have stayed the same.[24] For instance, once a system has been

2  deployed, organizations are to conduct "[a] system audit [which] is a one-time or periodic

3  event to evaluate security" and to "monitor[] … ongoing activity [to] examine[] either the

4  system or the users."[25] One audit specifically mentioned (and used more commonly in the

5  industry today) is "Penetration Testing," which is described as follows:

6  > Penetration testing can use many methods to attempt a system break-in. In

7  > addition to using active automated tools as described above, penetration
   > testing can be done "manually." For many systems, lax procedures or a lack

8  > of internal controls on applications are common vulnerabilities that
   > penetration testing can target. Penetration testing is a very powerful
   > technique; it should preferably be conducted with the knowledge and

9  > consent of system management.[26]

10  58.    If Radlink had conducted even a basic penetration test to look for cyber

11  security weaknesses, it would have uncovered the Vulnerabilities and would have

12  promptly fixed them. The nature of the Vulnerabilities (i.e., that they are caused by

13  misconfigured files and settings) suggests that Radlink's system had been vulnerable

14  since it first implemented the Portals, many years ago. Had Radlink conducted any

15  penetration testing over that time, it would have been alerted that its systems are

16  vulnerable—especially given that the specific JBoss vulnerability had been warned of

17  since at least 2013—and it would have fixed the issues immediately.

18  59.    Radlink's actions are alarming. Patients both expect and paid for (as a part

19  of their medical payments) the confidentiality of their private medical information as part

20  _____

[24]    U.S. Department of Commerce, Technology Administration, National Institute of

21  Standards and Technology, *Generally Accepted Principles and Practices for Security
   Information Technology Systems*, 24 (available at http://csrc.nist.gov/publications/nistpubs/800-
   14/800-14.pdf).

22  [25]    *Id.*
   [26]    *Id.* at 25.

23

1   of receiving and paying for medical treatment, but Radlink exposed that information.

2   Moreover, Radlink profited by not allocating necessary resources to keep that

3   information confidential (*e.g.*, by implementing industry standard information security).

4   And while Radlink took recent steps to secure the patient data in its control—only after a

5   patient took it to task for failing to do so—that does not excuse Radlink's long-standing

6   policy of ignoring plain security risks and, for months or years, exposing patients'

7   confidential information.

8   **III.     Patient Medical Information is a Primary Target for Hackers.**

9         60.     Patients were not only injured by Radlink's failure to provide the security

10  they paid for, but because Radlink exposed their information for months (if not years),

11  they run the risk of being victims of further harm, including identity theft and physical

12  harm from altered medical records.

13        61.     This risk is especially great for Radlink, considering the sensitive type of

14  information with which it has been entrusted. While companies of all sizes are

15  increasingly at risk of having sensitive information stolen, the risk is exacerbated in the

16  medical industry as patients' confidential medical records become digitized. Identity

17  thieves have specifically targeted confidential medical information because that data is

18  more valuable than other types, such as even credit card numbers. As a result, medical

19  organizations and companies that provide services to those organizations have been

20  specifically warned to strengthen security measures.

21        62.     In a June 2007 report on data theft, the United States Government

22  Accountability Office noted that identity thieves use stolen information to open financial

23  accounts, receive government benefits, and incur charges and open credit in a person's

27

1  name.[27] As the report states, this type of identity theft is the most harmful because it may

2  take some time for the victim to become aware of the theft, which can adversely impact

3  the victim's credit rating. Victims of identity theft will face "substantial costs and

4  inconveniences repairing damage to their credit records . . . [and their] good name."[28]

5      63.   Worse, a person whose personal information has been compromised may

6  not see any signs of identity theft for years:

7      "[I]n some cases, stolen data may be held for up to a year or more before
       being used to commit identity theft. Further, once stolen data have been
       sold or posted on the Web, fraudulent use of that information may continue
8      for years. As a result, studies that attempt to measure the harm resulting
       from data breaches cannot necessarily rule out all future harm."[29]

9

10     64.   Stolen medical information is a valuable commodity to identity thieves who

often trade the information on cyber black-markets. Indeed, entire online "underground

11

exchanges" have been created "where hackers sell [stolen] information," such as "names,

12

birth dates, policy numbers, diagnosis codes and billing information."[30] On these

13

exchanges, "medical information is worth 10 times more than [] credit card number[s]."[31]

14

One report noted that "[h]ealth insurance credentials are especially valuable in today's

15

economy because health care costs are causing people to seek free medical care with

16

these credentials."[32]

17

---

18  [27]    *See* United States Government Accountability Office, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* www.gao.gov/new.items/d07737.pdf.

19

[28]    *Id.*

[29]    *Id.*

20  [30]    *Your medical record is worth more to hackers than your credit card | Reuters,* www.reuters.com/article/ 2014/09/24/us-cybersecurity-hospitals-idUSKCN0HJ21I20140924

21  (last visited Feb. 10, 2017).

[31]    *Id.*

22  [32]    *Why hackers want your health care data most of all | InfoWorld,* www.infoworld.com/article/2983634/ security/why-hackers-want-your-health-care-data-breaches-most-of-all.html (last visited Feb. 10, 2017).

23

65.     Examples of medical data breaches are legion. The U.S. Department of Health and Human Services Office for Civil Rights maintains an up-to-date list of every reported "breach[] of unsecured protected health information affecting 500 or more individuals."[33] At last count, there were over 1,600 reported incidents since October 2009—more than one breach every other day.[34] In one recent case, a "niche pharmaceutical company" suffered a breach of "50,000 records" and was being held ransom by a "hacker who [was looking] to sell the data to the highest bidder or back to the company, whichever comes first."[35]

66.     In another example from September of 2015, Systema Software, a company that works with physicians and clinics to provide access to patients' medical information over the internet (not unlike Radlink), improperly secured the confidential medical information of approximately 1.5 *million* patients.[36] There, Systema Software apparently failed to implement industry-standard authentication protocols, allowing a "self-described 'technology enthusiast'" to breach its systems to access and download patients' "name, Social Security Number, phone number, address," "financial transaction data," and "insurance claim forms with some medical/health information." Had Systema Software implemented basic security features, the breach would have been thwarted. As it stands, the company joins the growing list of companies that have been breached.

---

[33] *U.S. Department of Health & Human Services - Office for Civil Rights*, ocrportal.hhs.gov/ocr/breach/ breach_report.jsf (last visited Feb. 10, 2017).
[34] *Id.*
[35] *Akorn Inc. has customer database stolen, records offered to highest bidder | CSO Online*, www.csoonline. com/article/2938032/data-breach/akorn-inc-has-customer-database-stolen-records-offered-to-highest-bidder.html (last visited Feb. 10, 2017).
[36] *Oops! Error by Systema Software exposes millions of records with insurance claims data and internal notes (Update2)*, http://www.databreaches.net/oops-error-by-systema-software-exposes-millions-of-records-with-insurance-claims-data-and-internal-notes/ (last visited Feb. 10, 2017).

1     67.     In fact, the American Bar Association published a book warning companies

2  that store patient data that "[m]assive data breaches are occurring with alarming

3  frequency. An analysis of data breaches by industry should provide a wake-up call for the

4  health care industry."[37] The ABA went on, saying that "[f]ailed security has resulted in

5  massive data breaches that led to the loss or compromise of millions of personally

6  identifiable health care records. … In almost all cases, data breaches that occurred could

7  have been prevented by proper planning and the correct security design and

8  implementation of appropriate security safeguards."[38]

9     68.     As such, companies entrusted with sensitive patient medical information

10  must be vigilant against threats and employ (at a bare-minimum) industry-standard cyber

11  protection. Any cost borne by the company to implement those practices is dwarfed by

12  the cost faced by consumers who are victim to a medical data breach. The "average total

13  cost" of medical identity theft is "about $20,000" per incident, according to a report by

14  Experian, and the majority of victims of medical identity theft are forced to pay out-of-

15  pocket costs for health care they did not receive (*i.e.*, fraudulent medical billing and

16  services) just to restore medical or insurance coverage.[39] Indeed, almost half of medical

17  identity theft victims lose their health care coverage as a result of such incidents, nearly

18  one-third will see their insurance premiums rise, and forty percent are likely to never to

19

20

21  [37]     *Health Care Data Breaches and Information Security*, www.americanbar.org/content/ dam/aba/publications/books/healthcare_data_breaches.authcheckdam.pdf (last visited Feb. 10, 2017).

22  [38]     *Id.*
[39]     *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, news.cnet.com/8301-27080_3-10460902-245.html (last visited Feb. 10, 2017).

23

1  get closure of their identity theft.[40] Data breaches and identity theft have a crippling

2  effect on individuals and detrimentally impact the entire economy as a whole.

3       69.    Importantly, the disclosure, release, and theft of medical data has effects far

4  beyond money costs, including dangerous physical consequences and reputational harm.

5  In 2014, CBS News reported that "[m]edical identity theft can threaten health as well as

6  bank account[s]."[41] The report went on to state that "15 percent of the medical identity

7  theft victims surveyed reported that the theft had created misinformation in their medical

8  records that led to a misdiagnosis, and 14 percent said they experienced a delay in

9  care."[42] Because of this, "[t]he impact of medical identity theft can be even more dire

10  than financial identity theft."[43]

11       70.    And in a February 2015 study, the Ponemon Institute—a group "dedicated

12  to independent research and education that advances responsible information and privacy

13  management practices within business and government"—reported that "medical identity

14  theft affected [victims'] reputation mainly because of embarrassment due to disclosure of

15  sensitive personal health conditions."[44] Ponemon went on to report that the leak of that

16  potentially embarrassing personal health information has led victims to "miss out on

17  career opportunities" and lose their jobs.[45]

18       71.    Given the recognized targeting of patient data by identity thieves, it is no

---

19  [40]    *Id.*

    [41]    *Experts say medical identity theft is "low-hanging fruit" for thieves; cite limited police

20  attention and lack of record-keeping - CBS News*, http://www.cbsnews.com/news/medical-identity-theft-can-threaten-health-as-well-as-bank-account/ (last visited Feb. 10, 2017).

21  [42]    *Id.*

    [43]    *Id.*

    [44]    Ponemon Institute, *Fifth Annual Study on Medical Identity Theft*, (Feb. 2015) available at

22  http://medidfraud.org/wp-content/uploads/2015/02/2014_Medical_ID_Theft_Study1.pdf

    [45]    *Id.*

23

1   surprise that Defendant's servers (which stored the confidential patient data entrusted to

2   Defendant and were accessible online) were compromised. Radlink's websites were

3   operating for months (or years) with the vulnerabilities described here. And because of

4   poor security management and administration, there is a strong chance that Radlink was

5   ignorant of unauthorized access/use stemming from the website vulnerabilities.

6       72.    As such, the only way to further protect Plaintiffs' and other similarly

7   situated patients' confidential patient data is to require Defendant to allow an independent

8   third-party firm to conduct a security audit its systems to determine the extent of any data

9   breach that may have already occurred. Without the assurance of an independent third

10   party auditor who can establish that no breach occurred, Plaintiffs and members of the

11   Class cannot be certain that Radlink has not impaired the integrity of their private

12   medical information.

13   <div align="center">**PLAINTIFF BLUM'S EXPERIENCE**</div>

14       73.    Plaintiff Blum has been a patient at facilities using Radlink medical

15   devices, including a FastMed location in Glendale, Arizona. On June 20, 2013, Plaintiff

16   received x-rays, and as a result, FastMed created electronic records of Plaintiff's visits

17   that were accessible through Radlink's systems. Plaintiff paid (directly through

18   deductibles and/or copays and indirectly through her insurance premiums) for the

19   medical care she received.

20       74.    Plaintiff paid for the medical care she received because she had the

21   reasonable expectation that FastMed and its business associates, including Radlink, were

22   keeping her medical information confidential. Moreover, Plaintiff understood and

23   expected that companies entrusted with confidential medical information are required by

1    law (*e.g.*, HIPAA) to use industry standard security protections to safeguard the data and

2    keep it confidential.

3        75.    Plaintiff values the privacy of her confidential medical information and

4    avoids doing business with companies with lax data security protocols. Had she known

5    that FastMed—through Radlink—would store her confidential medical information in an

6    unsafe and insecure manner, she never would have engaged FastMed in the first instance.

7    **PLAINTIFF GARST'S EXPERIENCE**

8        76.    Plaintiff Garst has been a patient at facilities using Radlink medical

9    devices, including a Cedars Sinai location in Los Angeles, California. On July 10, 2016,

10   Plaintiff received x-rays, and as a result, Cedars Sinai created electronic records of

11   Plaintiff's visits that are and were accessible through Radlink's systems. Plaintiff paid

12   (directly through deductibles and/or copays and indirectly through his insurance

13   premiums) for the medical care he received.

14       77.    Plaintiff paid for the medical care he received because he had the

15   reasonable expectation that Cedars Sinai and its business associates, including Radlink,

16   were keeping his medical information confidential. Moreover, Plaintiff understood and

17   expected that companies entrusted with confidential medical information are required by

18   law (*e.g.*, HIPAA) to use industry standard security protections to safeguard the data and

19   keep it confidential.

20       78.    Plaintiff values the privacy of his confidential medical information and

21   avoids doing business with companies with lax data security protocols. Had he known

22   that Cedars Sinai—through Radlink—would store his confidential medical information in

23   an unsafe and insecure manner, he never would have engaged Cedars Sinai in the first

33

instance.

## CLASS ALLEGATIONS

79.   **Class Definitions:** Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(b)(3) on behalf of themselves and a Class of similarly situated individuals, defined as follows:

> All persons in the United States who had their medical information stored electronically by Defendant on or before November 4, 2016.

The following persons are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

80.   **Numerosity:** On information and belief, tens of thousands of consumers fall into the Class definition. Members of the Class can be identified through Defendant's records.

81.   **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class and, pursuant to Fed. R. Civ. P. 23(b)(3), predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

(a)     Whether the hackers who compromised Defendant's servers

34

breached patients' confidential medical information;

    (b)    Whether Radlink disclosed or released patients' confidential medical information;

    (c)    Whether Radlink failed to adequately secure patients' confidential medical information;

    (d)    Whether Radlink has been unjustly enriched;

    (e)    Whether Radlink violated the California Confidential Medical Information Act; and

    (f)    Whether Radlink violated the California's Unfair Competition Law.

82.    **Typicality**: Plaintiffs' claims are typical of the claims of other members of the Class, in that Plaintiffs and the members of the Class continuously sustain injury arising out of Defendant's wrongful conduct.

83.    **Adequate Representation:** Plaintiffs will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class. That is, Plaintiffs and the Class members each had their confidential medical information insecurely stored on Defendant's servers and paid for Radlink's services with a portion of each payment to be uses for the administrative costs of data management and security. Plaintiffs also have no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

84.    **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies that Plaintiffs challenge apply and affect members of the Class uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs. The factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the Class are the same.

85.    **Superiority**: This case is also appropriate for certification, pursuant to Fed. R. Civ. P. 23(b)(3), because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of individual prosecution of litigation to redress Defendant's actions. Absent a class action, it would be difficult if not impossible for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered

1    and uniformity of decisions will be ensured.

2    86.    Plaintiffs reserve the right to revise the foregoing "Class Allegations" and

3    "Class Definition" based on facts learned through additional investigation and in

4    discovery.

5    **COUNT I**
     **Unjust Enrichment**
6    **(On behalf of Plaintiffs and the Class)**

7    87.    Plaintiffs incorporate by reference the foregoing allegations as if fully set

8    forth herein.

9    88.    Plaintiffs and members of the Class conferred a measurable monetary

10   benefit on Defendant. Defendant received and retained money belonging to Plaintiffs and

11   the Class in the form of a portion of the medical fees paid to Defendant. Plaintiffs paid

12   their service providers for their radiological services and, as a result of the direct

13   relationship between those service providers and Defendant, a portion of their payment

14   was transferred to Defendant.

15   89.    Defendant appreciates or has knowledge of such benefit.

16   90.    A portion of the medical fees that Plaintiffs and the Class paid to Defendant

17   was to be used by Defendant, in part, to pay for the administrative costs of data

18   management and security (*i.e.*, to keep their confidential medical information

19   confidential).

20   91.    Under principles of equity and good conscience, Defendant should not be

21   permitted to retain the money belonging to Plaintiffs and members of the Class.

22   Defendant failed to keep Plaintiffs' and Class members' medical information confidential

23   and to implement industry standard data management and security measures to secure

37

1    patients' confidential medical information, and under such circumstances, Defendant's

2    retention of the benefit without payment would be unjust.

3         92.    Accordingly, Defendant has received money from Plaintiffs and the Class

4    through the unlawful practices alleged herein, which in equity and good conscience

5    should be returned.

6                                  **COUNT II**
                **Violation of the California Confidential Medical Information Act**
7                          **(On behalf of Plaintiffs and the Class)**

8         93.    Plaintiffs incorporate by reference the foregoing allegations as if fully set

9    forth herein.

10        94.    California's Confidential Medical Information Act ("CMIA") was enacted

11   to protect against the unauthorized release or disclosure of confidential medical

12   information. The CMIA prohibits entities from negligently disclosing or releasing any

13   person's confidential medical information.

14        95.    Defendant is a "contractor" as defined by Cal. Civ. Code § 56.05 (d)

15   because it is a "medical group, independent practice association, pharmaceutical benefits

16   manager, or a medical service organization and is not a health care service plan or

17   provider of health care."

18        96.    Plaintiffs and members of the Class are "patients" as defined by Cal. Civil

19   Code § 56.05 (k).

20        97.    Defendant negligently maintained confidential medical information by

21   operating a misconfigured and out-of-date computer system, failing to implement

22   adequate security protocols to prevent unauthorized access to confidential medical

23   information, failing to maintain an adequate electronic security system to prevent data

                                              38

1   breaches, and failing to employ industry standard and commercially viable measures to

2   mitigate the risks of any data breach or otherwise comply with HIPAA data security

3   requirements.

4        98.    As a result of Defendant's negligent actions, Defendant released Plaintiffs'

5   and other Class members' confidential medical information by allowing unauthorized

6   third parties to view and/or access the confidential medical information stored on its

7   online servers. Given the totality of the circumstances—that Defendant's websites

8   providing access to confidential medical information were vulnerable, its systems were

9   being hacked by unauthorized third parties, and confidential medical information is

10   prized by hackers—these allegations will likely have evidentiary support after a

11   reasonable opportunity for further investigation or discovery (e.g., a review of the server

12   logs and records exclusively in Defendant's control).

13        99.    As a direct and proximate result of Defendant's negligence, it released

14   Plaintiffs' and the Class members' confidential medical information. As described in the

15   complaint, the confidential medical information released by Defendant is "individually

16   identifiable" as defined by Cal. Civ. Code § 56.05 (j) because "medical information

17   includes or contains any element of personal identifying information sufficient to allow

18   identification of the individual, such as the patient's name, address, electronic mail

19   address, telephone number, or social security number, or other information that, alone or

20   in combination with other publicly available information, reveals the individual's

21   identity." *See* Figure 4.

22        100.   Defendant's release of confidential medical information occurred entirely

23   in the State of California. Defendant maintains its servers in California, and, as a result,

39

1   any time Plaintiffs and members of the Class received care in states other than California

2   Defendant completed each transaction in the State of California.

3       101.   Plaintiffs and the Class never provided Defendant with authorization to

4   release their confidential medical information in the manner described above.

5       102.   Accordingly, Plaintiffs, on behalf of himself and members of the Class,

6   seek to recover actual and nominal (including $1,000 nominal damages per release, under

7   § 56.36 (b)(1)) damages, together with reasonable attorneys' fees and costs.

8   **COUNT III**
    **Violations of California's Unfair Competition Law**
9   **Cal. Bus. & Prof. Code §§ 17200, *et seq.***
    **(On behalf of Plaintiffs and the Class)**

10      103.   Plaintiffs incorporate by reference the foregoing allegations as if fully set

11  forth herein.

12      104.   California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code

13  §§ 17200, *et seq.*, protects both consumers and competitors by promoting fair

14  competition in commercial markets for goods and services.

15      105.   The UCL prohibits any unlawful, unfair, or fraudulent business act or

16  practice, including the employment of any deception, fraud, false pretense, false promise,

17  misrepresentation, or the concealment, suppression, or omission of any material fact. A

18  business practice need only meet one of the three criteria to be considered unfair

19  competition.

20      106.   Plaintiffs and members of the Class received medical care and radiological

21  services. As a part of those services, electronic medical records were transmitted to

22  Defendant in California. As such, Defendant has collected and maintained Plaintiffs' and

23

1    the Class members' confidential medical information on its servers in California.

2    Moreover, Defendant was exposing Plaintiffs' and the Class's confidential medical

3    information from its servers in California.

4         107.    Defendant violated the UCL by:

5              a.      Engaging in deceptive and fraudulent acts and practices by

6    representing and advertising that it would maintain adequate data privacy and security

7    practices and procedures to safeguard Plaintiffs' and Class members' confidential

8    medical information from unauthorized disclosure, release, data breaches, and theft; and

9    representing and advertising that it does and would comply with the requirements of

10   relevant federal and state laws pertaining to the privacy and security of confidential

11   medical information;

12             b.      Engaging in deceptive and fraudulent acts and practices by omitting,

13   suppressing, and concealing the material fact of the inadequacy of the privacy and

14   security protections for Plaintiffs' and the Class's confidential medical information.

15   Before and at the time that Class members were seeking medical care, Defendant failed

16   to disclose to its clients (e.g., physicians, clinics, and radiologists) that its systems were

17   out-of-date and vulnerable. Had Defendant disclosed that information to its clients,

18   Plaintiffs and the Class would not have had to use Defendant's systems and their

19   confidential medical information would not have been exposed (i.e., physicians and

20   clinics would not have knowingly used Defendant's vulnerable systems);

21             c.      Engaging in unfair acts and practices by establishing the sub-

22   standard security practices and procedures described herein; by soliciting and collecting

23   Plaintiffs' and Class's confidential medical information with knowledge that the

1   information would not be adequately protected; and by storing Plaintiffs' and the Class's

2   confidential medical information in an unsecure electronic environment. These unfair

3   acts and practices were immoral, unethical, oppressive, unscrupulous, unconscionable,

4   and/or substantially injurious to Plaintiffs and the Class. Defendant's practice was also

5   contrary to legislatively declared and public policies that seek to protect consumer data

6   and ensure that entities who solicit or are entrusted with personal data utilize appropriate

7   security measures, as reflected by laws like the Federal Trade Commission Act (15

8   U.S.C. § 45), HIPAA (42 U.S.C. § 1302d *et seq.*), the Gramm-Leach-Bliley Act (15

9   U.S.C. § 6801), and California's Confidentiality of Medical Information Act (Civil Code

10  §56 *et seq.*). The harm these practices caused (and continues to cause) to Plaintiffs and

11  members of the Class outweighed their utility, if any;

12          d.      Engaging in unfair acts and practices with respect to the sale and

13  operation of its medical devices by failing to disclose that its services were vulnerable.

14  These unfair acts and practices were immoral, unethical, oppressive, unscrupulous,

15  unconscionable, and/or substantially injurious to Plaintiffs and members of the Class. The

16  harm these practices caused (and continues to cause) to Plaintiffs and the Class

17  outweighed their utility, if any;

18          e.      Engaging in unlawful business practices by violating the privacy and

19  security requirements of HIPAA (42 U.S.C. § 1302d *et seq.*); and

20          f.      Engaging in unlawful business practices by violating California's

21  Confidentiality of Medical Information Act (Civil Code §56 *et seq.*).

22      108.    As a direct and proximate result of Defendant's unfair and unlawful

23  practices and acts, Plaintiffs and members of the Class were injured and lost money or

42

1    property, including but not limited to the premiums, copays, and/or money received by

2    Defendant for the radiological services and the loss of their legally protected interest in

3    the confidentiality and privacy of their confidential medical information.

4         109.    Defendant knew or should have known that its computer systems and data

5    security practices were inadequate to safeguard Plaintiffs' and Class members'

6    confidential medical information. Defendant's actions in engaging in the above-named

7    unfair practices and deceptive acts are negligent, knowing and willful, and/or wanton and

8    reckless with respect to the rights of Plaintiffs and members of the Class.

9         110.    Plaintiffs and members of the Class seek relief under Cal. Bus. & Prof.

10   Code § 17200, et. seq., including, but not limited to, restitution to Plaintiffs and Class

11   members of money or property that the Defendant may have acquired by means of

12   Defendant's deceptive, unlawful, and unfair business practices, restitutionary

13   disgorgement of all profits accruing to Defendant because of its unlawful and unfair

14   business practices, declaratory relief, attorney's fees and costs (pursuant to Cal. Code

15   Civil Pro. §1021.5), and injunctive or other equitable relief.

16                              **PRAYER FOR RELIEF**

17        **WHEREFORE**, Plaintiffs Debra Blum and Jordan Garst on behalf of themselves

18   and members of the Class, pray for the following relief:

19        a.    An order:

20             i.    Declaring that Defendant's conduct, as set out above, constitutes

21                   unjust enrichment and violations of California's Confidential

22                   Medical Information Act and Unfair Competition Law ;

23             ii.   Awarding injunctive and other equitable relief as is necessary to

43

1    protect the interests of Plaintiffs and the Class, including an order (i)

2    prohibiting Radlink from engaging in the wrongful and unlawful acts

3    described herein; (ii) requiring Radlink to protect all data collected

4    through the course of its business in accordance with its own

5    representations, HIPAA regulations, federal, state and local laws,

6    and industry standards; (iii) requiring Radlink to engage

7    independent, third-party forensic security professionals as well as

8    internal security personnel to conduct analysis of relevant logs and

9    records to determine whether Radlink's systems have already been

10   breached or if Radlink's exposure of patients' private medical

11   information through the Vulnerabilities and malware constitutes a

12   data breach; and (iv) requiring Radlink to promptly notify members

13   of the Class if it is determined that Radlink has already been

14   breached or the Vulnerabilities and malware constitute a breach;

15   iii.   Awarding actual damages to Plaintiffs and the Class, where

16         applicable, in an amount to be determined at trial;

17   iv.   Awarding restitution to Plaintiffs and the Class in an amount to be

18         determined at trial

19   v.    Awarding reasonable attorney's fees and expenses;

20   vi.   Awarding pre- and post-judgment interest, to the extent allowable;

21         and,

22   vii.  Awarding such other and further relief as equity and justice may

23         require.

1

## JURY DEMAND

2      Plaintiffs request trial by jury of all claims that can be so tried.

3                                              Respectfully Submitted,
                                             **DEBRA BLUM and JORDAN GARST**
4                                              individually and on behalf of all others similarly
                                             situated,

5
Dated: February 10, 2017                      By:  /s/ Benjamin S. Thomassen
6                                              One of Plaintiffs' Attorneys

7                                              John E. Kelly
                                             john@klawteam.com
8                                              Kelly Law Team
                                             1 E Washington Street, Suite 500
9                                              Phoenix, Arizona 85004-2558
                                             Tel: 602.283.4122
10                                             Fax: 602.281.6885

11                                             Rafey S. Balabanian (*pro hac vice*)
                                             rbalabanian@edelson.com
12                                             Eve-Lynn J. Rapp (*pro hac vice*)
                                             erapp@edelson.com
13                                             EDELSON PC
                                             123 Townsend Street
14                                             Suite 100
                                             San Francisco, California 94107
15                                             Tel: 415.212.9300
                                             Fax: 415.373.9435

16
                                             Benjamin S. Thomassen (*pro hac vice*)
17                                             bthomassen@edelson.com
                                             EDELSON PC
18                                             350 North LaSalle Street, 13th Floor
                                             Chicago, Illinois 60654
19                                             Tel: 312.589.6370
                                             Fax: 312.589.6378

20

21

22

23

1

## **CERTIFICATE OF SERVICE**

2        I, Benjamin S. Thomassen, an attorney, hereby certify that on February 10, 2017, I
served the above and foregoing to by causing a true and accurate copy of such paper to be filed
3   and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

4                                                     /s/ Benjamin S. Thomassen

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

46